1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3 Before The Honorable William Alsup, Judge

4

5 MASTEROBJECTS, INC.,       )
                       )
6      Plaintiff,     )
                       )
7 vs.               )  No. C 20-08103-WHA
                       )
8 AMAZON.COM, INC.,        )
                       )
9      Defendant.     )
                       )
10 _____)

11                           San Francisco, California
                           Wednesday, April 6, 2022

12    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC
        SOUND RECORDING 11:05 - 12:31 - 86 MINUTES
13

14 APPEARANCES:

15 For Plaintiff:
                        Hosie Rice LLP
16                    505 Sansome Street
                    Suite 1575
17                    San Francisco, California
                     94111
18              BY:  DIANE SUE RICE, ESQ.
              BY:  DARRELL RAE ATKINSON, ESQ.
19
  For Defendant:
20                    Hueston Hennigan LLP
                    523 West Sixth Street
21                   Suite 400
                    Los Angeles, California 90014
22              BY:  MOEZ MANSOOR KABA, ESQ.

23

24        (APPEARANCES CONTINUED ON NEXT PAGE)

25

2

```
1  APPEARANCES:   (Cont'd.)

2  For Defendant:
                              Hueston Hennigan LLP
3                             620 Newport Center Drive
                              Suite 1300
4                             Newport Beach, California
                              92660
5                        BY:  CHRISTINA VON DER AHE RAYBURN,
                                 ESQ.
6                        BY:  THOMAS KING, ESQ.

7
   Transcribed by:            Echo Reporting, Inc.
8                             Contracted Court Reporter/
                              Transcriber
9                             echoreporting@yahoo.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1  Wednesday, April 6, 2022                              11:05 a.m.

2                        P-R-O-C-E-E-D-I-N-G-S

3                              --oOo--

4          THE CLERK:  Now calling civil action 20-cv-08103,

5  MasterObjects, Inc. versus Amazon.com.

6      Counsel, state appearances, please.

7          MS. RICE:  Good morning, your Honor.  Diane Rice

8  of Hosie Rice for MasterObjects, Inc., along with my partner

9  Darrell Atkinson.

10         THE COURT:  Welcome to you.

11     And?

12         MR. KABA:  Good morning, your Honor.  Moez Kaba,

13 Christie Rayburn and Tom King on behalf of defendant.

14         THE COURT:  On behalf of who?

15         MR. KABA:  Defendant Amazon.

16         THE COURT:  Okay.  Welcome to you.

17     Well, we're here for two motions.  And let's take up

18 the one regarding terminating sanctions based on unclean

19 hands first.  Whose motion is that?

20     Yours?  Okay.  You come forward -- you can't argue the

21 entire thing.  It's just too much.  Come up here to the

22 lectern.  But I do want you to make your most important

23 points, so that I will certainly have that in mind.  But

24 don't just summarize your argument.  That won't do me any

25 good.

4

1     And we won't have time for all those slides.  You can

2  give them to me anyway, but I want you to focus on the most

3  important one or two slides.

4     Okay.  I am generally up to speed on what the problem

5  is, and let me just summarize the way I understand it.

6     You say that Amazon and MasterObjects went at it some

7  years ago in a different case on the earlier patent '526 --

8  is that the number -- and in the course of that, you

9  explained why Amazon did not infringe that, the '529 patent.

10 And then MasterObjects turned around and did supplemental

11 claims in a new patent based on the same disclosure that

12 would read right on the Amazon product.

13     There are two problems that I see with your argument.

14     One is that they have evidence that they had already

15 decided to make those claims.  That's number one.

16     And number two, that you don't even admit that it reads

17 on your product.  And that to me is a showstopper.  If you

18 won't admit that it reads on your product, I don't see how

19 you can possibly win this motion.  You're trying to have it

20 both ways.

21     You know, "Hypothetically, if it did read on our

22 product, it would be unclean hands."  I think that's -- to

23 me that's too hypothetical.

24     All right.  You have about 10 minutes.  I'll try to be

25 quiet.  You take 10 minutes.  The other side gets 10

1  minutes.  And then we'll move to the other motion.

2      Please go ahead.

3          MS. RAYBURN:  Thank you, your Honor.  And I will

4  focus on your two questions.  So the first -- first, I want

5  to kind of visually illustrate what we're talking about by

6  showing you slide three of this slide deck.

7      That is MasterObjects patent portfolio.  It reflects

8  all of the patents in this family, the patents filed before

9  2011 when MasterObjects learned Amazon's confidential

10  information and the patents filed after 2011.

11      Now, MasterObjects sued Amazon in this lawsuit on all

12  four patents that MasterObjects obtained issuance of after

13  2011.  This is not a coincidence.  It is because

14  MasterObjects was focusing its patent claims on --

15          THE COURT:  I promise you that's not enough.  I

16  mean that's a decent argument, okay, it's not coincidence.

17  That's never enough.  That's not enough.

18      So you're going to have to have something better than

19  that.  You're going to have real proof that they took your

20  confidential information and then used it to -- that's what

21  you told me up-front, by the way.  You did.  You told me

22  up-front they used your information to draft these claims,

23  but then it turns out you don't have that evidence.  At

24  least it's not very strong so -- all right.

25          MS. RAYBURN:  We do have that evidence.  The

6

1 first --

2          THE COURT:  I see this.  I know this story

3 already.  So, yes, after 2011, they got continuation patents

4 and --

5          MS. RAYBURN:  Okay.  So --

6          THE COURT:  -- they now claim that they read on

7 yours and you say they don't even read on yours.

8          MS. RAYBURN:  Let me skip to slide six --

9          THE COURT:  All right.

10          MS. RAYBURN:  -- because there is a substantial

11 difference between the claims that they issued -- that they

12 pursued before 2011 and the claims that they issued after

13 2011.  And we have described this in our briefing, your

14 Honor.

15     The claims before very explicitly talked about a system

16 that could access both a cache and a content source.

17          THE COURT:  I'm sorry, mine are not numbered.  I

18 don't see the numbers.

19          MS. RAYBURN:  Slide six, I'm sorry.  They're very

20 small.

21          THE COURT:  Six.  Where is it?  I don't see it.

22          MS. RAYBURN:  Slide six.  It's very small in the

23 bottom right.

24          THE COURT:  I must be going blind.  Show me on

25 this.  I don't see any numbers.  I don't see any --

7

1          MS. RAYBURN:  Really?

2          That's seven.  Go back one.

3          THE COURT:  Where did you see a number?

4          Oh.  Okay.  You're right, there is a number there.

5          MS. RAYBURN:  Lesson learned, your Honor.

6          THE COURT:  Okay.  All right.  This is the one you

7  want me to look at?

8          MS. RAYBURN:  Yes.

9          THE COURT:  All right.  I'm looking at it.

10          MS. RAYBURN:  The patents that they pursued before

11  2011 very explicitly stated that a user must be able to get

12  responses to their queries from either a cache or a content

13  source.

14      Now, Amazon's position is that the more current claims,

15  because they were based on the specification that they are

16  based on, also require that a user be able to get

17  information in response to their queries from either a cache

18  or a content source.

19      But there's no question that the claims are less

20  explicit about getting information from the content source

21  than they were.  And that reflects a balancing act, your

22  Honor.

23      MasterObjects couldn't specifically -- very explicitly

24  drop the content source from its claims because it would

25  have highlighted the patent examiner to a significant change

8

1    in claims scope in a way that would cause the patent

2    examiner to look at the claims again and rethink about it.

3         So what MasterObjects --

4              THE COURT:  I don't get that.  If the original

5    disclosure disclosed cache only, or even implied cache only,

6    you're wrong about that, they could have gotten any number

7    of claims subsequently.  Who cares if the examiner is

8    alerted to something?  I don't get your point.

9              MS. RAYBURN:  So, first of all, your Honor, we --

10             THE COURT:  Unless there's a prior art problem.

11        Now, if you're saying there was a prior art problem

12   with cache only, that's a serious problem.  I agree with

13   that.  But that's not what you're saying.

14             MS. RAYBURN:  We are saying that.

15             THE COURT:  No, you didn't.  You did not say

16   anything about prior art or invalidity.

17             MS. RAYBURN:  Let me say it now --

18             THE COURT:  So back over it again, make it more

19   clear.

20             MS. RAYBURN:  First, the original disclosure does

21   not support cache only.  We have significant written

22   description and enablement arguments which we will pursue.

23        Second, eliminating the content source from the caching

24   claim limitations would significantly broaden those claim

25   limitations in a way that would implicate much more prior

1  art, which we are also going to argue an invalidity.

2      So what MasterObjects did is use Amazon's disclosed

3  information to narrow its claims in a -- to appear to narrow

4  its claims in a way very specific to the information that

5  Amazon conveyed to MasterObjects.

6      And this is in fact very similar to what happened in

7  the Gilead case.  In that case, a patentee learned

8  confidential information, waited for that information to

9  become public and then used that confidential information to

10  narrow their patent claims.

11      The court found that that was unclean hands, because

12  despite the fact that they waited for the confidential

13  information to become public, they were able to use that

14  confidential information to essentially thread the needle of

15  patent prosecution.

16      In patent prosecution, every patentee is trying to find

17  claims that they will both be able to sue other people with

18  but also will be narrow enough to get issued.  And

19  MasterObjects was unsuccessful in that effort as to Amazon

20  until 2011 when MasterObjects learned Amazon confidential

21  information and then was able to attempt to tailor its

22  claims.

23      Now, you are right that we do not admit that we

24  infringe these claims.  We believe these claims have the

25  exact same limitations as the original claims because that's

1 what the specification requires that they have.

2     But it is clear to us, based on a read of the changed

3 nature of the patent claims, that MasterObjects at least

4 attempted to tweak the patent claims in a way to have what

5 they believed was a credible infringement allegation, when

6 they did not have that before.

7     And a good illustration of essentially the threading of

8 the needle that MasterObjects was attempting to pursue is

9 the fact that when -- and I'm pointing specifically to

10 application number '984 on this slide six, your Honor.

11     MasterObjects had a patent that they tried to broaden

12 so much as to eliminate the cache.  And when they did that,

13 they couldn't get it issued over the prior art.  It was

14 invalid over the prior art.

15     So they were trying very hard to find a patent that was

16 narrow enough to get issued but broad enough to hit Amazon.

17 And it's no coincidence that they pursued a very specific

18 optimization of what's disclosed in their specification in

19 three different patents in the exact same way after Amazon

20 disclosed their confidential information.

21         THE COURT:  Let's make sure I understand the way

22 that Amazon -- does Amazon's product use a cache?

23         MS. RAYBURN:  No.

24         THE COURT:  Does it use a content source?

25         MS. RAYBURN:  No.

11

1          THE COURT:  What is the --

2          MS. RAYBURN:  Amazon's product -- MasterObjects

3 has claimed that Amazon's product has a cache.  Amazon's

4 products, nobody is claiming that it uses a content source,

5 to my knowledge.

6          THE COURT:  But what is the cache that -- is it

7 prior returns from something in words in the box where -- is

8 it a dictionary?  What is it, as plaintiff uses it?

9          MS. RAYBURN:  As plaintiff uses it --

10          THE COURT:  Then as you use it, do you agree with

11 it?  So help me on that, just the basic definitions.

12          MS. RAYBURN:  Okay.  As plaintiff uses the word

13 "cache," it seems to be any memory store.

14          THE COURT:  Any what?

15          MS. RAYBURN:  Any memory store.

16          THE COURT:  Sort?

17          MS. RAYBURN:  Store.

18          THE COURT:  Store.  Okay.

19          MS. RAYBURN:  Amazon submits that a cache, in the

20 context of this patent, is saved copies of the results of

21 prior uses of the system.  Under that understanding, Amazon

22 does not have a cache.

23     But according to MasterObjects' arguments, Amazon does

24 have a store of auto complete queries and responses that is

25 accessed.  It does not have an additional content source

1 after that store.

2     So MasterObjects is accusing one memory store of being

3 a cache.  Amazon submits that it is not, but that is where

4 we are, your Honor.

5          THE COURT:  Well, let's say you just had a

6 dictionary that was independent of prior queries.  What

7 would that be under -- would that be a cache or content

8 source?

9          MS. RAYBURN:  I think MasterObjects would go so

10 far as to argue that's a cache, which is why we have a

11 significant invalidity problem here, your Honor, based on

12 the way they're now arguing their patent --

13          THE COURT:  Okay.  But what do you contend it is?

14 You always -- the first thing you want to do is say what the

15 other side says so that you never admit a thing.  That's the

16 way it is with defendants.

17     But tell me what would you say a dictionary would be.

18          MS. RAYBURN:  So we contend that the claims system

19 is a content source with a cache sitting between the user

20 and the content source.  So the first time a user --

21          THE COURT:  Let me ask you a different question.

22     A plain old dictionary that has, let's say, 100,000

23 words in it.  What would that be?

24          MS. RAYBURN:  It would be a content source.

25          THE COURT:  All right.  Okay.

13

 1          MS. RAYBURN:  There would only be a cache between

 2   the dictionary and the content source if someone were saving

 3   copies of previous accesses to that dictionary.

 4          THE COURT:  All right.  That's what your view is.

 5   Okay.  All right.  That helps me.  Thank you.

 6          MS. RAYBURN:  Okay.

 7          THE COURT:  Now --

 8          MS. RAYBURN:  I would like to turn to our

 9   evidence --

10          THE COURT:  Wait a minute.  What is -- let's

11   say -- I'm going to give you a hypothetical here because I

12   don't know the record like you do.

13       But let's say that the original '529 before it was

14   issued had applied for a patent, but it used a cache only.

15   No dictionary, no -- just cache only.  And let's say it was

16   based on prior -- let me make real clear what I mean because

17   maybe I misunderstand what you say.

18       Let's say somebody puts in NCA and then it fills in

19   with another -- a NCAA.  All right?  That would then go into

20   a storage thing where the next time the same user or same

21   phone was used to say -- and they put in the word "N," then

22   NCAA would pop up and be one of the possibilities.  And that

23   would go on for hundreds and hundreds of times when somebody

24   puts in a search.  It would call up.  Is that what you -- do

25   you say that's what cache is or does the other side say

14

1 that's what a cache is?

2          MS. RAYBURN:  Let me make sure I understand.  So

3 you're NCAA, it's based on a user doing that search before,

4 right?

5          THE COURT:  Right.  That phone has been -- yes,

6 let's assume it's the same user.

7          MS. RAYBURN:  That is a cache.  Amazon does not do

8 that.

9          THE COURT:  All right.  That's good to know.

10     Now, let's take that example.  Let's say that the

11 application for the '529, before it was ever issued, called

12 out just the cache, to consult just the cache.  No content

13 source.

14     Do you understand what I'm asking now?  The claim would

15 be the same except it would just consult a cache, right?

16          MS. RAYBURN:  Right.

17          THE COURT:  My question is this, and this is what

18 I asked my law clerk and we couldn't get the answer.  Would

19 that have been invalid under the prior art?

20          MS. RAYBURN:  Probably, your Honor.  And we will

21 certainly be --

22          THE COURT:  Is there an anticipatory reference or

23 is this just an obviousness argument?

24          MS. RAYBURN:  I don't have in my mind an

25 anticipatory reference because that was not the claim in the

15

1  '529, and so those references weren't what was gathered.

2  We'll certainly be developing that in our --

3          THE COURT:  All right.  Let me ask the opposite

4  question then.

5      Let's say instead of cache, it had been limited to just

6  content source only.  It would only consult the content

7  source.  Would that have been invalid under --

8          MS. RAYBURN:  Yes.

9          THE COURT:  Would there have been anticipatory

10 art?

11         MS. RAYBURN:  I apologize, your Honor.  I don't

12 recall whether the art was anticipatory or obviousness, but

13 there was an original claim in the '529 patent that just

14 consulted a content source.  That was rejected by the patent

15 examiner.  And that is why MasterObjects brought the cache

16 into that claim, in order to --

17         THE COURT:  Are you sure?  And I asked that very

18 question, and you say the prosecution history would reveal

19 that.

20         MS. RAYBURN:  Yes.

21         THE COURT:  That if I go back and look at it, the

22 original application said content source only, and then that

23 got rejected and that's how cache got into it?

24         MS. RAYBURN:  Yes.

25         THE COURT:  Okay.  That's important for me to

16

1  know.  I did not know that.  I suspected that, because I

2  said why in the world -- why did they claim both?  Why

3  didn't they just claim one?

4          MS. RAYBURN:  Original claim one --

5          THE COURT:  Usually it's an invalidity problem and

6  the examiner was smart enough to see it but -- all right.

7      Still I have this -- what is your best evidence?

8  You're trying to win this on summary judgment.  Is this an

9  issue for the judge or for the jury?

10          MS. RAYBURN:  So unclean hands, your Honor, is an

11  issue for the jury (sic), which is why I don't believe this

12  is summary judgment at all.  This is a request for

13  terminating sanctions and your inherent authority and

14  also --

15          THE COURT:  You said for the jury.  You meant the

16  judge?

17          MS. RAYBURN:  I did mean the judge.  I apologize.

18  Unclean hands is for the judge.

19          THE COURT:  Well, why shouldn't I wait and have it

20  fought out at trial where I can see all the witnesses under

21  oath rather than this incomplete paper record?

22          MS. RAYBURN:  Because the witnesses that

23  MasterObjects has claimed that they would want to bring

24  won't add anything to this and also because Amazon shouldn't

25  be forced to suffer through an entire patent case.

17

1          THE COURT:  You don't even admit that it covers
2  your claim -- your product.

3          MS. RAYBURN:  I --

4          THE COURT:  You want to say if -- "If by chance it
5  covers our product, then they copied it."

6          MS. RAYBURN:  My argument is that they tried to
7  cover our product but they were limited by their own patent
8  specification.  Their patent specification does not allow
9  for a construction that allows them to cover our product but
10 they're doing their darndest.

11     I would like to turn to Mr. Smith, the named inventor
12 and CEO's admissions regarding this.  He admits that he
13 received Amazon confidential information, that he used that
14 confidential information during the prosecution of his
15 patents in an attempt to best hone his patents to make it
16 harder for Amazon to get out of --

17         THE COURT:  Read to me the testimony.

18         MS. RAYBURN:  Okay.  So I have it on slides 21
19 through 24, your Honor, if you'd like to follow along.

20         THE COURT:  Okay.  21.  I'm at 21.

21         MS. RAYBURN:  Okay.  On 21 he's admitting that he
22 learned Amazon confidential information from his attorneys
23 and that it was his understanding that that information
24 should be kept confidential.

25     On 22 then he says, "The purpose of reformulating the

1 claim is to more clearly define what the actual invention

2 was and that indeed includes making sure that the claim

3 covers what we believe infringing parties did."

4　　　"And that includes Amazon, right?"

5　　　"Yes.  I always believed that Amazon was one of the

6 parties infringing on our patent."

7　　　He says that again on page 23, your Honor.

8　　　Question, "Is it fair to say at least one of the

9 purposes of drafting the new claims that resulted in the

10 patents in suit was to not have the same problem that,

11 quote, 'enabled Amazon to get out of infringement,'

12 unquote?"

13　　　"I think that's fair to say."

14　　　　　THE COURT:  All right.

15　　　　　MS. RAYBURN:  Finally, on 24, he makes clear that

16 he did not try to essentially segment his brain.  There was

17 no effort to not use the confidential information learned

18 from Amazon.

19　　　To the contrary, he thought -- he claims to have

20 thought he was allowed to use all of Amazon's confidential

21 information in patent prosecution.

22　　　　　THE COURT:  Well, but where does he say "I used

23 the information from Hosie Rice that came from Amazon to

24 reformulate our claims"?

25　　　　　MS. RAYBURN:  Well, he says he reformulated his

19

1  claims based on what he knew about Amazon and he says he

2  learned --

3          THE COURT:  Where does he say that?  What he

4  believed Amazon did.

5          MS. RAYBURN:  Right.

6          THE COURT:  That's not the same thing as saying

7  that belief is based on information that came from the

8  lawyers.

9          MS. RAYBURN:  Okay.  True.

10          THE COURT:  It could just be his speculation.

11          MS. RAYBURN:  Well, if I can turn your attention

12  to slide 19, your Honor.  This is an email from the lawyers

13  to Mr. Smith after a WebEx meeting that everybody agrees was

14  confidential and subject to a protective order and an

15  agreement of confidentiality.

16          THE COURT:  I've actually read this very email.

17  All right.  Go ahead.

18          MS. RAYBURN:  In --

19          THE COURT:  But look at the first paragraph.  He

20  says "I cannot share with you the details.  I can provide

21  high level conclusions."  Is there some wrong with that?

22          MS. RAYBURN:  There's nothing wrong with providing

23  high level conclusions, your Honor.  But we should open our

24  eyes to what is in the rest of that email.  It's

25  significantly more than high level conclusions.

1          THE COURT:  Okay.  Show me where it starts to go

2  low level?

3          MS. RAYBURN:  Due to the public nature of this

4  hearing, I don't want to read it out loud, but I would

5  submit that almost everything in these paragraphs is low

6  level.  It identifies exactly what type of memory store

7  Amazon uses.  It identifies how many suggestions are saved

8  in that memory store.  It confirms Mr. Smith's theory about

9  where and how that memory store is replicated across

10 servers.

11     There is a lot of detail here, your Honor, and this is

12 not detail that either Mr. Nelson or Mr. Smith had before

13 the confidential WebEx meeting.

14          THE COURT:  All right.  Let me ask those people

15 out there -- there's two of them -- my law clerks.

16     How about you two over there?  Are you spies?

17          UNIDENTIFIED SPEAKER:  (Indiscernible.)

18          THE COURT:  I can't hear you.  I'm sorry, you're

19 outside counsel for who?

20          UNIDENTIFIED SPEAKER:  (Indiscernible.)

21          THE COURT:  I can't hear what she's saying.

22          MS. RAYBURN:  Facebook, now Meta.

23          THE COURT:  Is that a party in this case?

24          MS. RAYBURN:  No.  MasterObjects has also sued

25 them.

21

1          THE COURT:  But you're not supposed to be --
2  that's a different lawsuit.

3      All right.  Since you're -- I don't want to -- I was
4  going to let them talk out loud about confidential stuff.

5      All right.  Let me say, you see the sentence that
6  starts "More fundamentally"?  It says, "More fundamentally,
7  accepting what they say as true, the Amazon auto completion
8  service utilizes," and I won't read from the rest of that.

9      Now, are you saying that the rest of that sentence was
10  confidential information?

11          MS. RAYBURN:  Yes.  That is more detail than they
12  had before, and it was shared with Mr. Nelson under a clear
13  promise that it would not be used for any purpose other than
14  the settlement of that litigation.

15          THE COURT:  Okay.  And this email is to the
16  inventor from Nelson.

17          MS. RAYBURN:  It's actually, importantly, to both
18  the inventor from Mr. Nelson and also to MasterObjects'
19  patent prosecution attorney.  And this is just the tip of
20  the iceberg, your Honor.

21      If you'll turn the page, MasterObjects' privilege log
22  conveys that there was a flurry of activity between the
23  inventor, the patent prosecution attorney, and the Hosie
24  Rice law firm after that July 19, 2011 meeting.  On the
25  order of 30 or 40 emails were exchanged, when before that --

22

1          THE COURT:  Well, do you have those too?

2          MS. RAYBURN:  They have not produced them.

3          THE COURT:  Well, how did you get this one?

4          MS. RAYBURN:  MasterObjects has voluntarily waived

5 privilege over just a few that I believe MasterObjects

6 thinks are the best --

7          THE COURT:  You can't do that.  It's called

8 selective waiver.

9          MS. RAYBURN:  I agree, your Honor.  May I ask for

10 guidance on that?

11          THE COURT:  Well, is this the case where Harold

12 McElhinney (phonetic) is the special master?

13          MS. RAYBURN:  Yes and --

14          THE COURT:  Raise it with him.

15          MS. RAYBURN:  Well, to be clear, your Honor, Mr.

16 McElhinney believes that this Court's orders provide that no

17 more motions to compel may be filed because there was a

18 deadline for motions to compel.

19     So my understanding is that he believes he needs

20 further authorization from you to entertain any further

21 motions --

22          THE COURT:  I don't remember why I said that.  Why

23 did I say that?

24          MS. RAYBURN:  It's I believe one of your standing

25 orders, motions to compel, the deadline is before the close

23

1 of fact discovery.

2          THE COURT:  Well, have we passed -- has the
3 discovery period ended?

4          MS. RAYBURN:  We are well past the discovery
5 period.

6          THE COURT:  Okay.  Well, then -- I didn't realize
7 that.  Well, maybe you're out of luck then.

8          MS. RAYBURN:  Well, your Honor, if MasterObjects
9 voluntarily started waving privilege over these documents
10 and has been fiddling out documents as recently as last
11 week --

12          THE COURT:  When is the trial in this case?

13          MS. RAYBURN:  Not until October, your Honor.

14          THE COURT:  All right.  I'm going to think about
15 that.  I don't like selective waiver, and MasterObjects is
16 going to be in trouble with me doing selective waiver.

17     All right.  Now, can you show me the email where -- or
18 something where your side conveyed to the other side the
19 information that is in that sentence?  Just focus on that
20 one sentence.

21          MS. RAYBURN:  So I can't, your Honor, because what
22 happened is on July 19th of 2011, the parties held a
23 confidential WebEx meeting and --

24          THE COURT:  Like Zoom?

25          MS. RAYBURN:  That's like Zoom.  Exactly.

24

 1          THE COURT:  And during that meeting, Amazon

 2  presented two documents and the declaration of an Amazon

 3  engineer.  And Mr. Nelson, MasterObjects' counsel, spent an

 4  hour reviewing those documents at that meeting.

 5      The next day he turned around and sent this email.

 6          THE COURT:  Yeah, but what I'm saying is you

 7  surely have a record of what you provided to Mr. Nelson,

 8  don't you?

 9          MS. RAYBURN:  Well, there's no email because it

10  was just what was shown on there.

11          THE COURT:  Well, do you have a record of that,

12  the materials that were shown to him?  Can't you reconstruct

13  that?

14          MS. RAYBURN:  No.  What I have, your Honor, is I

15  have Mr. Nelson's internal memo to file.  "This is what I

16  learned on this meeting" and like the same day this email to

17  Mr. Smith.

18          THE COURT:  Okay.  That would be good.  That would

19  be good.  But do you also have the original stuff that was

20  shown to him so that you could prove categorically that the

21  information in that sentence came from that WebEx?

22          MS. RAYBURN:  Well, I'm not sure, but wouldn't Mr.

23  Nelson's email saying that he learned this exact thing

24  during that meeting be enough?

25          THE COURT:  I don't know.  I'm suspicious.  When

1  you can't go to the horse's mouth, it makes me wonder.

2          MS. RAYBURN:  I know that I have --

3          THE COURT:  You don't need to show it to me now.

4  That would be good to have.

5      All right.  You've run out of time.  We've used 30

6  minutes on this, and I need to give the other side a chance

7  to respond.  And I'll give you a brief rebuttal later on.

8          MS. RAYBURN:  Thank you, your Honor.

9          THE COURT:  All right.  First off, who's going to

10 speak?  You've got to answer have you done a selective

11 waiver.  If you have, I'm upset.

12         MR. ATKINSON:  Yes, your Honor.  This is Darrell

13 Atkinson for MasterObjects.

14         THE COURT:  And if you tell me that, I'm probably

15 going to let them get at Harold McElhinney to get those

16 other privileged documents, and if it turns out you've done

17 selective waiver, I'm going to tell the jury about it.

18     So you better -- right now is your chance to explain.

19         MR. ATKINSON:  Your Honor, our lead counsel

20 Spencer Hosie individually reviewed every item on the

21 privilege log that Amazon has complained about, and he has

22 determined that the documents we have produced are the ones

23 that are within the scope of a waiver.  We produced about I

24 believe 47 documents on our privilege log.

25     We are set to meet and confer with Amazon this week on

1 this very issue, and we would not object to --

2        THE COURT:  I'll tell you what the guideline is.

3 Anything that pertains to what Mr. Nelson learned in that

4 WebEx, whether it's ways to redraft claims, whether it's --

5 whatever.  Anything that logically flowed from that WebEx,

6 you have waived the privilege and you'd better produce them.

7        MR. ATKINSON:  Okay.

8        THE COURT:  Just take that to heart.  That's the

9 way I feel about it.  I don't like selective waiver.  And

10 what I will do is say, "Ladies and gentlemen, this plaintiff

11 right here -- yeah, you got to see that one email, but you

12 know what, they didn't give the rest of the stuff that

13 relates directly to that.  And you can take into account the

14 selective waiver."

15     So you'd better take to heart that selective waiver is

16 no good.

17        MR. ATKINSON:  Yes, your Honor.  We will take it

18 to heart.  We will go back and will re-review, given that,

19 and we also don't object to the discovery master hearing

20 this issue as well.

21        THE COURT:  All right.  Let's pass that for now.

22     Tell me what your main points are on this motion.

23        MR. ATKINSON:  Yes, your Honor.  The first main

24 point relates to the email that Amazon was just showing you

25 from July 20th between Mr. Nelson and MasterObjects' CEO,

27

1 Mark Smith.

2          THE COURT:  Okay.

3          MR. ATKINSON:  Your Honor, one thing Amazon has to

4 do is to show that there is an immediate and necessary

5 relationship between any information disclosed to Mr. Smith

6 and this litigation.  So to do that, they have to show that

7 he actually used the information.

8     What they contend in terms of use is that what Mr.

9 Smith allegedly learned was not just that there is a two-

10 step process that's not performed, that is where you hit a

11 cache and if it's a cache miss, you hit an underlaying data

12 source.  What they also say and what they say this

13 additional July 20th email revealed was that you don't hit a

14 content source at all.  Ever.

15     But if I direct your Honor to Exhibit F, which is an

16 email between Nelson and Mr. Smith from June 15th, you will

17 see that that information was already known to MasterObjects

18 from subsequent -- from prior conversations with Amazon.

19     So their entire reply brief which is based on this

20 predicate, well, there is this additional July information,

21 it's not additional over the June information.  And Amazon

22 all but --

23          THE COURT:  Wait, wait.  That's a good point if

24 it's true.  Show me the email from June that covers the same

25 information.

*Echo Reporting, Inc.*

28

1          MR. ATKINSON:  I would read it aloud, your Honor,

2  but I'm worried that it's information that Amazon considers

3  confidential.

4          THE COURT:  Do you have a copy you can hand up to

5  me?

6          MR. ATKINSON:  I can show it to you on my screen,

7  your Honor.

8          THE COURT:  Oh, that's no good.  Young lawyers

9  need to learn --

10          MR. ATKINSON:  It's Exhibit F, your Honor, to the

11  Hosie declaration.

12          THE COURT:  All right.  Always come with your top

13  three or four documents ready to hand up to the judge.

14          MR. ATKINSON:  I apologize.

15          THE COURT:  Don't hand up a computer.  Hand up the

16  document.

17          MR. ATKINSON:  I've grown too used to technology,

18  your Honor.

19          THE COURT:  No, no.  I don't care about

20  technology.  I want the document so I can hold it in my

21  hand.

22      My law clerk has come up here and found it, so go

23  ahead.

24          MR. ATKINSON:  Your Honor, in the first paragraph,

25  it's the third sentence that reads "According to."  It

29

 1  begins "According to."  And you'll see that that sentence
 2  does not just talk about a miss.  It says that period, a
 3  content source is not checked.

 4          THE COURT:  Now, this is before the agreement on
 5  confidentiality?

 6          MR. ATKINSON:  Yes, your Honor.  That agreement
 7  was July 14.  This email is June 15.

 8          THE COURT:  Okay.  Just a second.

 9      Now, okay, I do tend to -- I'd have to do a word-for-
10  word comparison to the other email, but that -- you
11  definitely -- it is true that this gives information that
12  explains why Amazon says it does not infringe and how their
13  system works.

14          MR. ATKINSON:  Yes, your Honor.  And just to be
15  clear, what's important is what Amazon alleges was actually
16  used.  And what they do in their briefing is they frame the
17  information they pointed to in the July email and they said
18  how it was used.  And the how of use is the fact that a
19  content source is not checked at all, as opposed to a
20  content where it's not being checked on a cache miss.

21      So what Amazon conceded was that in June we learned the
22  second thing, that on a miss, no content source is checked.
23  And in July we learned the first thing, which is that no
24  content source is checked at all.  And that is not the case,
25  your Honor.

30

1      The second important point, your Honor, is your Honor
2  is correct that this motion is premature.  Several of the
3  arguments that Amazon's counsel has made here today
4  illustrate that point.
5      For one, Amazon's counsel gets into written description
6  disclosure.  They point out that they have 112 arguments.
7  They're fighting over the scope of these disclosures, which
8  are issues that your Honor will be in a better position to
9  know about post-trial in a bench trial.
10      The same is true of claim construction, your Honor.  So
11  critical to this analysis is the issue as to whether
12  MasterObjects, prior to ever suing Amazon, had any claims
13  that are similar to the claims asserted today.  Amazon says
14  no.  MasterObjects says yes.
15      The claim language in those claims is very similar to
16  language your Honor will be construing in this case.  So
17  given that debate as well, it doesn't seem possible to
18  resolve this issue for several reasons, your Honor.
19           THE COURT:  Well, but their point is that -- one
20  of their points is that the prior language was arguably on
21  point but it was also arguably not.  And so you use the
22  information you got from them to tweak the language so that
23  it would get closer.
24      Now, that's the argument.  And that the reason you
25  didn't just come right out and do a claim that read exactly

1  on the product was that it would been invalid under the

2  prior art or that the specification didn't support it.

3          MR. ATKINSON:  Your Honor, several points on that.

4      One, if we're getting into issues about validity and

5  infringement, what Amazon's system actually does, and that

6  is required to address fully this motion.  That is the

7  reason this motion is premature.

8          THE COURT:  You've raised a good point.  That does

9  bother me.  And so, yes, I see that point.

10          MR. ATKINSON:  A second one is Amazon says

11  basically -- if Amazon's position in claim construction is

12  found to be correct, Amazon says that MasterObjects

13  attempted to cover Amazon but did so badly that it failed.

14      And if that is true, that proves the untenability of

15  Amazon's position.  That's definitely something in

16  MasterObjects' favor --

17          THE COURT:  What --

18          MR. ATKINSON:  Sorry, your Honor.

19          THE COURT:  What is your -- show me the language

20  in a claim.  Maybe you've got a slide or you can hand up the

21  actual -- but don't show me a computer screen.  Show me the

22  claim language that you think gets cache only.

23          MR. ATKINSON:  Yes, your Honor.  Let me just grab

24  up Amazon's slide.

25          THE COURT:  Please.

32

1        (Pause.)

2            THE COURT:  Hand it to the clerk, please.

3            MR. ATKINSON:  These are the claims in suit, and

4   that's the language we're fighting about.  And as you can

5   see, your Honor, that language says -- it references a

6   content source.  It says:  a query result cache, and that is

7   based on results previously retrieved from a content source

8   or data from a content source.

9            THE COURT:  Wait.  '073, Claim One.  You're saying

10  all the other elements of Claim One are satisfied?

11           MR. ATKINSON:  We say that.  I'm sure Amazon

12  disagrees, but yes, your Honor.

13           THE COURT:  Does the other side agree that all the

14  other elements are satisfied?

15           MR. ATKINSON:  No, they do not, your Honor.

16      The fight about invalidity infringement is not just

17  over the caching limitations.  There other limitations

18  which, again with further briefing, will be clear to your

19  Honor that are in dispute in both claim construction and

20  infringement, including one sort of critical to this notion

21  that our changes are directed towards Amazon, your Honor.

22      As we pointed out in our briefing, one of the big

23  things that happened here was we had a case against Google.

24  We lost the claim construction of Judge Hamilton and our

25  prior strategy then changes as a result.  But it has nothing

33

1  to do with Amazon, your Honor.

2      I mean if you look at the time frames involved, it

3  doesn't even make sense.  They're saying that back in 2011

4  we learned the stuff about Amazon and then we filed a patent

5  application in 2013, another one in 2016, another one in

6  2017.  We got one of those in 2016.

7      We then waited four years to sue Amazon, waited until

8  we got additional patents, sued Meta platform first but yet

9  the strategy is all about Amazon?  It just doesn't make

10 sense, your Honor.

11          THE COURT:  All right.  I'm looking at '073

12 patent, Claim One, just the language that you gave me in

13 this slide.  I want to see if it covers just -- "cache only

14 matching," comma, "by the server system," comma, "the

15 screens to entries in a cache of query strings and search

16 results based on content queries received from multiple

17 users whereby cache search results contain a subset of data

18 of more and more content sources."

19     Now, I eventually will understand, but that has a lot

20 of extra phrases in there that goes way beyond cache only.

21 "Multiple users," for example.  "Based on content queries

22 received from multiple users."

23     Then the word "subset."  I'd have to understand this

24 better, but this -- hold on.  I was hoping you could show me

25 something that just said match by the server systems to the

34

1 cache of prior queries and search results, period, end of

2 story.

3      You don't have that.  It's got a bunch of mumbo-jumbo

4 in here.

5           MR. ATKINSON:  Well, your Honor, but that's sort

6 of my point.  It's because of the issues like this, the

7 Court's not yet in a position and of course the inclination

8 that this is premature is correct.

9      So, MasterObjects -- sorry, Amazon says the opposite

10 when it comes to what that means for the purposes of claim

11 construction infringement from what it says for purposes of

12 this motion.

13      So Amazon's actual position in this case is that that

14 is not a cache only, what they define as a cache only term.

15           THE COURT:  So look at the other one.  It's kind

16 of interesting here.  '866, patent one.  "Matching by the

17 server system the screen to entries in a cache of query

18 strings and search results previously retrieved from one or

19 more content sources."

20      So the cache has got to be one that is constructed from

21 prior results from one or more content sources.  So you've

22 got the word "content" back in here.

23           MR. ATKINSON:  Your Honor, I --

24           THE COURT:  That would be a dictionary, I guess,

25 right?

35

1          MR. ATKINSON:  Well, your Honor, I guess,

2    understands this gets into why this is premature.

3       So the parties' positions have to fight about as well

4    not just what a cache is but what a content source is.

5       So Amazon's position seems to be that a content source

6    has to be some sort of underlying database always

7    independent of a cache.

8       Our position is a content source is just a source of

9    data such that it can be a dictionary or it can be another

10   cache or it can be the earlier version of the same cache.

11      So, your Honor, these are all things that not only in

12   terms of interpreting these current asserted claims but in

13   this motion, we also have these problems of interpreting the

14   claims that MasterObjects said existed in 2007 and 2010 that

15   should already have this claim strategy that Amazon says it

16   is based on Amazon information.

17          THE COURT:  All right.  Make one more point, and

18   then I've got one question for the other side and then we've

19   got to the other motions.  So I'll give you one more

20   opportunity to make one more important point.

21          MR. ATKINSON:  Your Honor, my last point is very

22   short, your Honor, and it's in our opposition brief at

23   length.

24      Mr. Smith, MasterObjects' CEO, did not testify as

25   Amazon characterizes it.  He was asked a very explicit

36

1   question as to whether or not he did this based on Amazon

2   information.  And he responded no.  And the actual quote is

3   in our brief and it's the deposition exhibit cited in our

4   brief, your Honor.  That's my final point.

5          THE COURT:  Thank you.  All right.  Let me ask the

6   other side.

7       What do you say to the point that on June 15th there's

8   a -- before the confidentiality agreement and before the

9   agreement that it will not be used for prosecution, there's

10  this email that gets at the same point?

11         MS. RAYBURN:  I have two responses to that, your

12  Honor.

13      First, we presented the declaration of Mr. Chatterjee

14  who said he explicitly reached an agreement with Mr. Nelson

15  that anything that happened even before -- this agreement

16  happened before the June 14th email -- that all

17  conversations between the parties would not be used for any

18  other purpose.

19      We presented that declaration.  Mr. Nelson disagrees.

20  So I'm not relying on that right now because there is an

21  argument between the parties.

22      The second point is that, your Honor, I'd like to turn

23  your attention to slides 13 through 14 of this deck because

24  it shows how MasterObjects responded to that June 14th

25  email.  They didn't immediately say, "Oh, okay.  Based on

37

1 this information we will go pursue single cache claims."

2  The kerfuffle between them at that time was:  Well, we

3 don't really believe them.  Well, maybe later they'll do it

4 our way.  We need more information to believe Amazon to know

5 that's what they're doing.

6  That is what they got on July 19th after the explicit

7 confidentiality agreement and that is -- the information on

8 the concrete confirmation of the information that they got

9 on July 19th is what they then used to prosecute their

10 patents.

11   THE COURT:  Okay.  Thank you.

12   MS. RAYBURN:  Thank you, your Honor.

13   THE COURT:  Now, let's go to the other motion.

14  And you get to go first.  Again, just give me your most

15 important points.

16   MS. RICE:  Thank you, your Honor.

17  We're here today because Mr. Sanford concealed his

18 prior Fliesler Meyer employment which has denied

19 MasterObjects certain rights under the law.

20  His lawyers --  I should say the Hueston Hennigan

21 lawyers have endorsed these concealments.  They falsely

22 claim that MasterObjects and Hosie Rice filed this motion

23 knowing that, quote, "Mr. Sanford knew nothing of

24 MasterObjects."  That's page 18 of their opposition, let

25 alone knowing anything about Fliesler Meyer --

38

1          THE COURT:  Wait.  Make sure I got the basic --
2    Sanford is the guy in question.

3          MS. RICE:  Yes.

4          THE COURT:  He was working for who initially?  The
5    first.

6          MS. RICE:  So Mr. Sanford initially was an
7    associate at the Fliesler Meyer firm, the patent prosecution
8    firm --

9          THE COURT:  For MasterObjects.

10          MS. RICE:  -- for MasterObjects.

11          THE COURT:  All right.

12          MS. RICE:  Yes.  He now leads the litigation in
13    this case on behalf of Amazon.  He runs the litigation.  He
14    decides the issues.  These lawyers report to Mr. Sanford.

15          THE COURT:  Did he ever work himself directly for
16    MasterObjects?

17          MS. RICE:  Well, I'm going to get to that.  He
18    filed a declaration in this case.  And he tries to have
19    excuses for his concealments and explains what he did and
20    what he didn't do at the Fliesler Meyer firm.  And I want to
21    get into that.

22      So he has three different types of concealments here.

23      One is his inadvertent deletion or gap or absence of
24    his Fliesler Meyer two-year stint on his resume, on his
25    LinkedIn resume.  It's not there.

39

1      Now, he says "Oh, I inadvertently left it off.  I don't
2  pay attention to my resume."  And that might be true, that
3  might not be true.
4      What we do know from his LinkedIn resume is that the
5  employments before the Fliesler Meyer two-year period and
6  the employment after the two-year period are all on there.
7  So --
8              THE COURT:  Was he a full-time employee?
9              MS. RICE:  Yes, your Honor.  Yes, he was.
10             THE COURT:  Was he a contract attorney or full-
11  time?
12             MS. RICE:  No, your Honor.  He was an associate.
13  And so, you know, we can't argue --
14             THE COURT:  But did he --
15             MS. RICE:  -- with his state of mind, obviously.
16             THE COURT:  All right, but --
17             MS. RICE:  But we think it's a red -- it's a red
18  flag.
19             THE COURT:  All right.  So that's a good point.
20  It looks suspicious.
21             MS. RICE:  Thank you.
22             THE COURT:  However, help me out with -- okay.  Go
23  ahead.  I'm interrupting you too much.
24             MS. RICE:  So now I want to answer your question
25  about his time at Fliesler Meyer, because he filed a

40

1  declaration in opposition to our motion to disqualify him

2  and the Hueston Hennigan firm.  And he says, "I didn't have

3  access to information about MasterObjects.  I didn't have

4  any exposure."  Okay?

5      So in response to that, Mr. Kenna, who also worked with

6  him at the Fliesler Meyer firm, filed a declaration in our

7  reply brief.  And what he tells us is -- and we know this

8  just from looking at the firm online at that time -- that

9  Fliesler Meyer is a very small San Francisco law firm,

10  contrary to Heller Ehrman or Brobeck, Phleger and Harrison.

11  And it shared space in a San Francisco office, one floor,

12  only two-thirds of it.  It subletted out the rest of it and

13  didn't use --

14          THE COURT:  Which building was it?

15          MS. RICE:  I don't have the address.  But it

16  probably is --

17          THE COURT:  Okay.  It's all right.

18          MS. RICE:  They might know.  But in any event,

19  they were cheek to jowl.  Okay?  And courts understand that

20  people who work in close quarters talk with each other about

21  their work.  That's the Gabriel Basin case.  And members of

22  the firms chat about cases in the hallways where their

23  discussions can be overheard and so on and so forth.

24      And in fact Judge Scotland in the Aerojet case, which

25  both parties rely upon, says it's inconceivable that there

41

1  wouldn't have been discussions among the attorneys in this

2  small firm, with the facts in front of him.  He said the

3  firm was too small and the matters at issue too closely

4  related to say there was no conflict.  It's an everyday

5  reality that attorneys --

6           THE COURT:  What years did he work there?

7           MS. RICE:  2000 to 2002.  I think he started late

8  2000 in October.

9       The critical point there, your Honor, it's at the time

10 that the '529 patent was drafted and was filed.  And so it

11 was a big issue and client for the firm at that time.

12      Now, the --

13          THE COURT:  Did he work on that?

14          MS. RICE:  So he claims he didn't work on it.  All

15 right?  But he had access to the information.

16      And under the law, when you have successive

17 representations like this, when you're working for one

18 client on one side, you know, the prosecution patent firm,

19 and then later you go in-house to Amazon and lead their

20 fight against the '529 patent that was drafted by the

21 Fliesler Meyer firm, the successive relationship and

22 representation law -- and we all cite it in our briefs -- is

23 that there is a rebuttable presumption that confidential

24 information could have been learned by the lawyer while at

25 the first firm, whether or not he worked on it.

42

1      And the presumption can be rebutted where the lawyer

2 can show -- and this is important, your Honor -- there was

3 no opportunity for confidential information to be divulged.

4 Let me say that again.  That there was no opportunity for

5 confidential information to be divulged.

6      And the law goes on to say, self-interested

7 declarations asserting no access, standing alone, will not

8 rebut the presumption.  All right?

9      So courts have held --

10          THE COURT:  And he is working where now?  At

11 Amazon or at the --

12          MS. RICE:  He's the lead lawyer in-house at

13 Amazon --

14          THE COURT:  Okay.  I thought you --

15          MS. RICE:  -- on this case.

16          THE COURT:  Okay.  But he's not at their law firm.

17          MS. RICE:  I don't believe he's in the courtroom

18 to defend himself.

19          THE COURT:  Well, maybe he'll have to be but --

20          MS. RICE:  Maybe he should be.

21          THE COURT:  But right now he's at Amazon.  He's

22 the head lawyer at Amazon?

23          MS. RICE:  He's the lead lawyer at Amazon on this

24 case running this case against my client who was -- he was

25 at this prosecution --

43

1          THE COURT:  Have they asserted --

2          MS. RICE:  But let me get on to --

3          THE COURT:  Wait.  Have they asserted that the

4 '529 is invalid?  In other words, does Amazon assert the

5 '529 is invalid?

6          MS. RICE:  Amazon uses the '529 -- it's central to

7 Amazon's claims and arguments in this case.  And its

8 position is that the preferred embodiment in fact defines

9 the invention, the '529 specification.  The '529

10 specification drives Amazon's claim construction arguments

11 in this case.

12          THE COURT:  No, no.  But, okay, that's not my

13 question.

14     Is Amazon contending that the '529 is invalid?

15          MS. RICE:  I --

16          THE COURT:  You don't know?

17          MS. RICE:  You'd have to ask them.  I --

18          THE COURT:  Haven't you all got invalidity

19 contentions?

20          MR. ATKINSON:  No, your Honor, they're not -- the

21 parent patent is not asserted in this case.  They share the

22 common specification with the patents here.

23          THE COURT:  All right.  So what do you say to that

24 point that -- you say that they were leading the charge

25 against the '529.  But the '529 is not asserted, so how can

44

1  anyone be leading the charge against it?

2         MS. RICE:  '529 is the parent patent of the three

3  patents that are at issue in this case, your Honor.

4         THE COURT:  Right.

5         MS. RICE:  It all goes back to the '529.

6         THE COURT:  But the only thing that would be

7  relevant would be the specification.

8         MS. RICE:  Yeah, and the specifications are

9  relevant.

10     But let me go back to access because this is the

11  important thing.  Under the law, the question is whether or

12  not he had access to confidential information.  And he

13  claims he didn't.

14     And the reason access is important is it's central to

15  the duty and the obligation to disclose your prior

16  affiliation at Fliesler Meyer, and he didn't do that.  He

17  has hidden it for 20 years.

18         THE COURT:  Okay.  He left it off the LinkedIn.

19  How else did he hide it?

20         MS. RICE:  Sure.  So the firm's attorneys were not

21  restricted from accessing any client file at that firm.

22  Karl Kenna, who was also at the firm with Mr. Sanford at the

23  same time, testified under oath in his declaration that he

24  doesn't recall any restrictions being placed on accessing

25  MasterObjects' files.

45

1       THE COURT:  Well, wait.  That's different from
2  remembering that there were none.  When you say "I can't
3  recall whether or not there were any" is not the same thing
4  as saying "I do recall and there were none."
5      That's a lawyer trick to say "I don't recall any
6  restrictions."  Well, do they recall it well enough to know
7  one way or the other?  It begs the question.
8       MS. RICE:  No.  Mr. Henna says -- well, no one has
9  argued that the MasterObjects files were restricted in any
10 way.  They don't argue that.  We -- we --
11      THE COURT:  But you're the one that needs some
12 proof.
13      MS. RICE:  Mr. Kenna says "I don't remember them
14 being restricted at all."  And Mr. Sanford doesn't say they
15 were restricted.  He had access to it.  He could access.  He
16 could have learned MasterObjects confidential information.
17      THE COURT:  Who are the witnesses that we have on
18 what he did and what access -- is it just these two, these
19 two declarations?
20      MS. RICE:  Well, yes, that's part of the problem,
21 because he waited so long.  Mr. Kenna claims that he just
22 learned about the connection of Fliesler Meyer with
23 MasterObjects when Hosie Rice wrote a letter two months ago
24 telling the lawyers, "Hey, look, the lead lawyer at Amazon
25 was at this patent prosecution firm."  All right?  So he --

46

1          THE COURT:  Was MasterObjects known as

2   MasterObjects back then?  Or did it have a different name?

3          MS. RICE:  Same name, your Honor.  Same name.

4       And so he had an opportunity to access the files.  His

5   declaration denies that --

6          THE COURT:  But where are the files that existed?

7   Where are they today?  Who has them?

8          MS. RICE:  I assume they're at -- I shouldn't make

9   any assumptions.  I don't know if Mr. Kenna was asked that.

10          THE COURT:  Well, is that firm still in existence?

11          MS. RICE:  The Fliesler Meyer firm is not, to my

12   knowledge, in existence.  There's not the prosecution

13   counsel.

14          THE COURT:  Well, who -- did they merge into

15   another firm?  Tell me the history of the firm.  It would be

16   easy for us to go get those files and subpoena them and look

17   and see what he worked on.

18          MS. RICE:  Mr. O'Malley, who was also one of the

19   associates at the Fliesler Meyer firm, he is still on the

20   patent prosecution of this case.  So he could get the files

21   for us if needed.

22          THE COURT:  Well, then has anyone looked to see if

23   Sanders (sic), if his name shows up?

24          MS. RICE:  If whose name shows up?

25          THE COURT:  If -- is it Sanders?

47

 1          MS. RICE:  Sanford.

 2          THE COURT:  Sanford.  I think you raise some

 3 interesting problems, but there's more that could be

 4 obtained.

 5          MS. RICE:  Well, that's right.  And --

 6          THE COURT:  And why don't you go get depositions

 7 and --

 8          MS. RICE:  Your Honor, exactly so.  And so this is

 9 our problem.  When Hosie Rice discovered -- when we were

10 preparing Mr. Kenna for his deposition, Mr. Kenna,

11 because --

12          THE COURT:  Where does he work now?

13          MS. RICE:  Mr. Kenna --

14          What is his firm?

15          MR. ATKINSON:  Tucker Ellis.

16          THE COURT:  All right.

17          MS. RICE:  Mr. Kenna was an associate at Fliesler

18 Meyer.  They wanted to take his deposition to learn about

19 what he thought about the '529 specification.  They thought

20 it was really relevant to get his deposition, and so they

21 subpoenaed him.

22      So we were preparing him for his deposition several

23 months ago, and Mr. Kenna said "Who's working on this at

24 Amazon?" and spotted Mr. Sanford.  And he said, "You've got

25 to be kidding me.  Mr. Sanford was with me at Fliesler

48

1  Meyer."  You know, how could that be.  I mean it's really

2  remarkable.  What was --

3          THE COURT:  Did he say in the deposition or to you

4  in a way that could be repeated that he worked on the

5  MasterObjects file?

6          MS. RICE:  Mr. Kenna, did he say that?

7          THE COURT:  Yes.

8          MS. RICE:  No.  So what Mr. Kenna remembers is at

9  that firm, that there was no assignment or silo of attorneys

10  on one matter or another matter.

11      And this disputes what Mr. Sanford says in his

12  declaration.  He said, "I was assigned only to a certain

13  type of case and it wasn't anything related to

14  MasterObjects, as far as I remember.  I was just I was just

15  working on," I think he says, "non-software cases."

16      And so he disputes that.  But the test isn't whether or

17  not he worked on it.  The test under the law is whether or

18  not he had access to information and whether or not he can

19  prove that he had no exposure to it whatsoever.

20          THE COURT:  Wait.  Let me -- let's say the facts

21  were this, hypothetically, that it's true that he had no --

22  he never touched the file, MasterObjects, and that he never

23  even had a hallway conversation with someone working on

24  MasterObjects.  I know you're wait, wait, wait.  But bear

25  with me.

1        MS. RICE:  Okay.

2        THE COURT:  Let's say that that's true for a

3   moment.  But he did work on other things and it was at the

4   same time that MasterObjects was, let's say, a big client of

5   their firm.  What is the answer in that circumstance?

6        MS. RICE:  Well, that's partly the story here.

7   But there are some other pieces that go along with that,

8   your Honor.

9      The firm had regular all-hands meetings where --

10       THE COURT:  But according to him, they just talked

11  about new developments in the law.

12       MS. RICE:  Well, according to Mr. Kenna, that

13  wasn't true.  They would talk about --

14       THE COURT:  When I was in a law firm, that wasn't

15  true either.  They would talk about new developments in the

16  law but they would also talk about, "Hey, look at our great

17  victory."  When they lost a big case, it took a while.  But

18  when they got a big victory, they would come in and say

19  "Look, we've got a TRO.  Look at this, how great we are."

20  And then explain to the young people there how they got it.

21     So I did think that was a little suspicious, that he

22  claimed --

23       MS. RICE:  Right.

24       THE COURT:  -- they only talked about new

25  developments in the law, but maybe that's the way they ran

50

1 that firm.

2          MS. RICE:  No, that's not.

3          THE COURT:  That was not the way my firm was run.

4 I was head of the litigation department for a while and we

5 talked about cases all the time.

6          MS. RICE:  Well, why should we believe --

7          THE COURT:  But other firms don't have to do it

8 the same way that our firm did.

9          MS. RICE:  Kenna said that's not the way this firm

10 was run.  Mr. Kenna says that --

11          THE COURT:  Well, I am afraid I don't -- I don't

12 think I even read his declaration.  I don't even know about

13 his -- read me some of the stuff that Kenna -- McKenna (sic)

14 said.

15          MS. RICE:  Sure, I would be happy to.  And it is

16 attached to our reply brief, your Honor -- or, I'm sorry.  I

17 will get it.

18          THE COURT:  Wait, wait, this is a reply?

19          MS. RICE:  Yes.

20          THE COURT:  I guess it would be a reply.  Okay.

21          MS. RICE:  And it's document 292-28 for the

22 record.

23      So he says, paragraph two, "During 2000 to 2002, I

24 worked as a patent agent with Fliesler Dubb Meyer and

25 Lovejoy."  And Fliesler Meyer is a successive firm, your

1  Honor, to Fliesler Dubb Meyer and Lovejoy.  And he talks

2  about their principal place of office.

3      And what's interesting, your Honor, in paragraph three

4  is -- so Mr. Sanford gives a half-truth in his declaration

5  and talks about a Santa Clara office, the satellite office.

6      Well, Mr. Kenna explains that Mr. Sanford was not in a

7  satellite office.  He was in the office in San Francisco

8  with 13 lawyers.  He was one of them.  The other two were

9  down in Santa Clara.  They lived in the South Bay.

10      But the 10 lawyers were cheek to jowl on two-thirds of

11  this one floor and in fact Mr. Kenna is a friend of Mr.

12  Sanford's.  And to this day they're friends.

13      And what does Mr. Kenna say?  He says the associates

14  were not siloed, that they weren't assigned to a single

15  partner, that they worked on a variety of matters, and at

16  these all-hands meetings, that they did talk about client

17  matters.  He did have exposure.

18          THE COURT:  Well, that's what he says.  But

19  maybe -- how do I get to the bottom of that?

20          MS. RICE:  Good question.  And this is all because

21  Mr. Sanford decided to hide it from everybody.  Okay?

22          THE COURT:  Well, you mentioned LinkedIn.  How

23  else did he hide it?  You said he hid it three ways, but

24  I've only heard one way.

25          MS. RICE:  Well, I think the most egregious hiding

52

1  of his knowledge of MasterObjects and the whole Fliesler

2  Meyer and Mr. Kenna and Mr. Fliesler and how they were

3  intimately involved in this patent litigation and the patent

4  prosecution is that he claims he only learned about the

5  connection between Fliesler Meyer and this case when Hosie

6  Rice brought it to the Hueston Hennigan attorneys two months

7  ago.

8       And we know that's not true, your Honor.

9            THE COURT:  How do we know it's not true?

10           MS. RICE:  Because there were dozens and dozens

11 and dozens of pleadings and filings.  Mr. Sanford has been

12 at Amazon since 2009, but he's been on this case for two

13 years.  He has seen every pleading.  He's seen every

14 declaration.  He signed declarations.  He helped prepare

15 witnesses.

16           THE COURT:  Which one of them -- yeah, but which

17 one would have mentioned that law firm?

18           MS. RICE:  Oh, in our brief, your Honor, we show

19 you all the times Fliesler Meyer, Karl Kenna his friend, and

20 Marty Fliesler were identified on documents.  And it's --

21 the weight of the evidence is enormous, and you will see it

22 when you read pages two through five in our reply brief.  We

23 lay out how many times he had access to this information.

24      Now, maybe he didn't read any of the pleadings.  Maybe

25 he signed declarations that he didn't read, but we find that

53

1  very implausible.

2      He helped prepare witnesses for depositions in this

3  case.  He knew that Mr. Kenna was being deposed, and he

4  worked on a brief related to Mr. Kenna and the subpoena for

5  Mr. Kenna.

6              THE COURT:  How do we know that he worked on that?

7              MS. RICE:  Because of what was filed.  And Mr.

8  Kenna told us that.  He was involved, your Honor.  They

9  won't deny that.

10             THE COURT:  All right.  I need to give the other

11 side some time.

12             MS. RICE:  Yes.  But I --

13             THE COURT:  I'll give you a rebuttal in a minute.

14             MS. RICE:  All right.  And I do want to address

15 their motion for sanctions too against us for bringing this,

16 but I can do that in --

17             THE COURT:  No.  That motion is denied.

18             MS. RICE:  Thank you.

19             THE COURT:  This is a legitimate motion.  I'm

20 denying sanctions.  That's crazy.

21     I'm this close to calling an evidentiary hearing to

22 find out -- make this guy come in here and testify, as well

23 as all these other people and find out -- we'll spend a day

24 getting testimony under oath where I see him on the stand

25 instead of all this paperwork.

54

1     So to say that this is a frivolous motion, I'm this

2  close to sanctioning you.  So go ahead.

3          MR. KABA:  Your Honor, may I --

4          THE COURT:  No, you're not going to get to argue.

5  It's on the papers.  You can respond to try to talk me out

6  of an evidentiary hearing.

7          MR. KABA:  I am going to do that, your Honor.  I

8  just want to start off by explaining what has happened here.

9     They began by filing a five-page motion for

10  disqualification.  There were no declarations from any fact

11  witnesses.  There was no Kenna declaration, despite Mr.

12  Kenna being represented by them.

13     The entire thing is about Mr. Sanford as a first year

14  associate working at a law firm, the Fliesler Meyer firm,

15  for about 18 months.  During that 18-month period, as it

16  turns out, others at that Fliesler Meyer law firm worked on

17  the '529 patent, a patent not asserted in this case.

18     Mr. Sanford has provided an unrebutted under oath

19  declaration saying he never worked on any MasterObjects

20  matter, period, full stop.

21     Mr. McKenna testified under oath about the attorneys

22  that worked on the '529 patent.  He identified them as

23  himself, Mr. Fliesler and Mr. O'Malley, never once

24  identifying that Mr. Sanford ever worked on the '529 patent

25  or worked on anything having to do with MasterObjects

1  whatsoever.

2      MasterObjects served interrogatory responses under oath

3  in this case where they were asked "Who are the attorneys

4  that worked on the '529 patent?"  And again, they identified

5  only Mr. Fliesler, Mr. Kenna and Mr. O'Malley.

6      Mr. Sanford then provides a declaration.  There was no

7  declaration in their brief about any indication that Mr.

8  Sanford had any connection to MasterObjects when he was at

9  the firm.

10      The questions that you (sic) began asking, which are

11  exactly the questions that the Court asked, "Well, did you

12  have something connecting Mr. Sanford to MasterObjects

13  during his time as a first year associate at Fliesler

14  Meyer?"  And the answer was resoundingly no.

15      Mr. Sanford responds under oath in his declaration,

16  which was submitted with our opposition, saying conclusively

17  "I did not work on any matter for MasterObjects or Mark

18  Smith, never rendered legal advice, didn't even know they

19  were a client of the firm."

20      We're talking about one patent.  During this time

21  period, Fliesler Meyer had filed 300 patent applications.

22      Mr. Sanford is a mechanical engineer, wasn't touching

23  software patents, your Honor.

24      So what did they come back with and what's been

25  referred to --

1        THE COURT:  By the way, I didn't believe that part

2   very much, to say I am a mechanical engineer so I didn't

3   work on software.  That is very suspicious.

4        MR. KABA:  Your Honor, in Mr. Sanford's -- his

5   year at that firm -- his year and a half actually --

6        THE COURT:  Now, he works on software, but back

7   then he did not.

8        MR. KABA:  Well, when he came --

9        THE COURT:  Is he going to get a Ph.D. or

10  something too?

11       MR. KABA:  He's come to Amazon and he's

12  responsible for handling lots and lots and lots of different

13  patent cases that are filed.

14     As a junior associate at Fliesler Meyer, he said, "I

15  was focused on mechanical engineering.  I worked with a

16  partner who focused on mechanical engineering."

17     So then the question is, well, what's the response.

18  There was no factual declaration submitted in the opening

19  brief.  The first time they did it was in the reply brief by

20  Mr. Kenna, who at the time was the patent agent at Fliesler

21  Meyer working on the '529 patent.

22     That's what you were just looking at, a declaration

23  submitted on reply.  In that declaration, your Honor, I urge

24  MasterObjects to identify a single sentence saying by Mr.

25  Kenna that Mr. Sanford in fact worked on any MasterObjects

57

1  information or even had any discussions about MasterObjects.

2      In fact, on client file restriction and access, what

3  Mr. Kenna says in paragraph eight is there were instances

4  where access to particular client files was restricted.  He

5  just doesn't recall whether there was a restriction on

6  MasterObjects files.

7      Again, paragraph nine, Mr. Kenna talked about these

8  group meetings.  He confirms they were generally in the

9  nature of practice development.  Occasionally -- according

10  to his recollection, occasionally during the meetings people

11  would provide updates as to particular client matters.

12      Again, your Honor, he's not saying we ever had a

13  discussion about MasterObjects.  He is also not saying that

14  these meetings were held in the 2000 time frame where they

15  talked about MasterObjects, about this single patent that

16  Mr. Kenna, as a patent agent, was working on with people

17  other than Mr. Sanford.

18      And, your Honor, the --

19          THE COURT:  But part of the law says I have to

20  take into account opportunity.  Even if he did not -- even

21  if he swears up and down "I didn't have anything to do with

22  MasterObjects," the law says I have to look also at whether

23  or not he had the opportunity.

24      And the declarations -- he said they never discussed

25  client matters at the firm meetings and the other guy Kenna

58

1  says they did.

2      So it could be that MasterObjects was discussed at one

3  of those meetings.

4          MR. KABA:  But Mr. Kenna doesn't even say

5  MasterObjects was discussed at one of those meetings.

6          THE COURT:  He doesn't have to.

7          MR. KABA:  No one -- but --

8          THE COURT:  No, no.  So you're understating what

9  the law allows a court to consider.

10         MR. KABA:  Your Honor, I'll tell you what the law

11 is, because we cited the same case.  In Ochoa, which is the

12 California appellate court decision, the court says this is

13 the standard that applies.  It comes from the Adams v.

14 Aerojet case and it's applied in Ochoa.

15     The court says, "Under the modified substantial

16 relationship test, a presumption that the attorney knows

17 confidential information applies only where the moving

18 party, that is the client of the attorney's former law firm,

19 makes an adequate showing that the attorney was in a

20 position vis-a-vis the client to likely have acquired

21 confidential information material to the client

22 representation."

23     Your Honor, there is not a paragraph, a sentence, a

24 shred of evidence that Mr. Sanford was in a position to

25 acquire or likely did acquire confidential information.

59

1      The Adams case said you have to look whether

2 information material to this representation -- that's one

3 question.  Is the '529 patent that was being worked on at

4 Fliesler Meyer at the time material to this firm's

5 representation -- would normally have been imparted to the

6 attorney during his 18 months at the old firm?

7      What counsel for MasterObjects cited to you, a sentence

8 from Adams, comes from the dissent in Adams where they say,

9 "Well, of course people talk to each other at firms."

10      The Adams court, your Honor, was dealing not with a

11 first year associate.  In that case, it was a named partner

12 at the law firm that had left and switched sides.  And the

13 Adams court said even then it's not enough.

14      Your Honor, in Ochoa it's another excellent example of

15 what is going on.  In Ochoa, the court has a partner at the

16 firm switching lead representation.  The evidence --

17           THE COURT:  But we've got exactly that here.

18 We've got a lawyer at that firm who's now switched over to

19 Amazon and is leading the charge against the -- at least the

20 specification on the '529.

21           MR. KABA:  Your Honor, that is distinctly

22 different.  You have --

23           THE COURT:  Why?  Why?  Why is that so bad -- I

24 mean why so different?

25           MR. KABA:  Because in this case, you have a lawyer

60

1  who 22 years ago was a first year associate at a law firm

2  that had no connection to this client.

3          THE COURT:  So he says.  So he says.

4          MR. KABA:  But no one --

5          THE COURT:  At the evidentiary hearing he might

6  fall apart.

7          MR. KABA:  But no one says otherwise, your Honor.

8  Subjecting lawyers to this sort of inquiry -- when the --

9          THE COURT:  I don't like the smell of this.  And

10  it's not in LinkedIn.  He left it out of LinkedIn and he's

11  hiding something.

12          MR. KABA:  Your Honor.  I understand but -- I

13  understand your concern, your Honor, but this is a very,

14  very thin reed upon which to sully someone's --

15          THE COURT:  All right.  Look, it's thin right now,

16  but they haven't had an opportunity to take his testimony

17  under oath.

18          MR. KABA:  Your Honor, they did have an

19  opportunity.  They represent Mr. Kenna.  That is their link

20  here, and Mr. Kenna testified under oath that three people

21  worked on the '529 patent.  Mr. Sanford was not one of them.

22      The San Gabriel case, your Honor, that they cite, that

23  case acknowledges that there will be hallway conversations,

24  and that case denies disqualification.

25          THE COURT:  Who has the files from that era?

1 Where can we find those files now?

2          MR. KABA:  From which, your Honor?

3          THE COURT:  From this law firm.  They've merged

4 with somebody.  These files still exist.  We can go back and

5 look at them.

6          MR. KABA:  Presumably, your Honor, those files

7 would have been with Mr. Kenna or Mr. O'Malley.  But like I

8 said, there are privilege logs that MasterObjects produced

9 in this case from 2000 to 2002.  They cover that time

10 period, your Honor.  No reference to Mr. Sanford on those

11 logs.

12     The MasterObjects internal business plans, your Honor,

13 talked about their patent prosecuting lawyers.  Again, no

14 reference to Mr. Sanford.  Mr. Kenna's testimony talked

15 about who worked while at Fliesler Meyer on this patent, the

16 '529 patent.  No reference to Mr. Sanford.

17     What you have is a chorus of voices identifying the

18 people at Fliesler Meyer who worked on this patent, the '529

19 patent, none of which ever referenced, represented,

20 indicated, implicated Mr. Sanford whatsoever.

21     And you have Mr. Sanford's declaration, which the

22 courts in Adams, in Ochoa, in Dieter and San Gabriel all say

23 is enough.  Where you have a lawyer saying "I did not work

24 on this matter.  I did not work with this client," that is

25 not grounds for disqualification.

1     And Ochoa identifies, your Honor, the burdens that have

2 to be placed, given the potential for this sort of motion to

3 be used to delay or disrupt litigation.

4          THE COURT:  On its face, it looks bad because of

5 the attribution rule.  Everyone at that law firm was deemed

6 to be representing MasterObjects, and now he's adverse to

7 MasterObjects.  And there are ways to get out from

8 underneath that, but it's not a frivolous point.

9          MR. KABA:  But, your Honor, the imputation or

10 attribution rule that you are describing does not -- the

11 Adams court, the California appellate court in Adams says

12 that does not apply when you're talking about an individual

13 lawyer who is leading a firm to go to a different practice.

14     That's why the Adams court -- that's why the

15 plaintiff's motion is not articulating the law.  The Adams

16 court makes clear there is a modified substantial

17 relationship test.

18     The inquiry is not this imputation upon imputation.

19          THE COURT:  Do both sides agree that the

20 California rules apply here, as opposed to -- we're in

21 federal court.  We're not in state court.

22          MR. KABA:  The California rules -- both sides are

23 citing the California cases, your Honor.

24          THE COURT:  I understand that, but I question

25 whether or not it's -- is it the California or not

63

1 California --

2          MR. KABA:  It is -- it is --

3          THE COURT:  All right.  I've got to let the other

4 side have a short say, and then I've got to bring this --

5          MR. KABA:  Your Honor, can I just respond to that

6 question?

7          THE COURT:  Go ahead.

8          MR. KABA:  The Ninth Circuit in In re County of

9 Los Angeles says federal court applies state law in

10 determining matters of disqualification.

11     And I just want to make one final urging, your Honor.

12 Ochoa lays out the standard.  It is a case with far more

13 egregious circumstances.  Where there is evidence -- not

14 opportunity -- there is actual evidence of access to files

15 by the partner, the court said the files were available and

16 he went into them and looked at them.

17     And in Ochoa, the court says that is not enough.  We

18 need -- the movement needs to show that it is reasonably

19 likely that this person actually worked on MasterObjects

20 information.  And not one piece of evidence, your Honor.

21 Not a paragraph in a declaration that they can point to.

22          THE COURT:  Okay.  Thank you.

23     I'm going to give you about a one-minute rebuttal.

24          MS. RICE:  I will be brief, your Honor.

25          THE COURT:  All right.  Is it true you only had a

64

1   five-page motion with no declarations?

2          MS. RICE:  Your Honor, no.  Well, we had -- no, it

3   wasn't five.  It was --

4          THE COURT:  Did you have any declarations?

5          MS. RICE:  We did not have any -- and here's the

6   reason why, your Honor.

7       Mr. Sanford denied having any information about

8   Fliesler Meyer or any knowledge that these --

9          THE COURT:  Well, where did you even get that

10  information?

11         MS. RICE:  It would have been a black box for us

12  to provide declarations.  We did not know what Mr. Sanford

13  was going to say.  He could have said, "Oh, you know what,

14  in retrospect, you're right, Ms. Rice."

15      We recently had no information because he hid it, your

16  Honor.  And --

17         THE COURT:  Well, wait a minute.  But you can't --

18  why can't you go to the firm that Kenna is at now and get

19  the files and see?

20         MS. RICE:  Well, what would the files show us --

21         THE COURT:  It might have showed his name on there

22  somewhere, a memo to file.

23         MS. RICE:  But it's Mr. Sanford's name we're

24  looking for, your Honor.

25         THE COURT:  Yeah, that's what I'm talking about.

1          MS. RICE:  What we're looking for -- what?

2          THE COURT:  Sanford's name may be in the file.

3          MS. RICE:  We don't have to prove that he worked

4 on a MasterObjects case back in 2000, 2001.

5          THE COURT:  It would help if you did.

6          MS. RICE:  You know, that would be fantastic if we

7 had that evidence.

8      What the law requires us is to show that he had access.

9 When you have successive representations of clients, you

10 have to -- what we have to show is that -- there's a

11 rebuttable presumption that he learned information in

12 successive representations.

13     And they can rebut it by showing that he didn't have

14 access, that he had no opportunity for exposure.  And

15 through Mr. Kenna --

16          THE COURT:  All they say is all he has to say is I

17 never worked on it, period, end of story.

18          MS. RICE:  You know what, you'll look at the law

19 and within two minutes, you'll realize that is not the case.

20          THE COURT:  I --

21          MS. RICE:  Can I just say with respect to

22 remedies, your Honor, Mr. Hosie asked Amazon counsel on

23 February 1, 2022 after we brought this to their attention,

24 whether Amazon would agree to remove Mr. Sanford from the

25 case because he couldn't be -- and wall him off, have him

66

1  work on something else -- we're not saying he should be

2  fired from Amazon.  He just should not be working on this

3  case.

4       And they -- you know, they said absolutely not.  They

5  wouldn't even entertain it.  They said it's ours to prove

6  that he worked on the MasterObjects case, which is not the

7  case.

8       Because of the concealment, because of these

9  attorneys --

10          THE COURT:  What were the three concealments

11  again?  I've got the LinkedIn, but you never gave me the

12  other two.

13          MS. RICE:  No.  The LinkedIn, the cursory,

14  conclusory, self-serving denial that he received any

15  MasterObjects information while employed at Fliesler Meyer,

16  which --

17          THE COURT:  Okay.  But we don't know for sure that

18  that's false.

19          MS. RICE:  But under the law, that's not enough.

20  Okay?

21          THE COURT:  Well -- but how we know that that's

22  not a true statement?

23     Okay.  What was the third thing?

24          MS. RICE:  And the third thing is that he claims

25  he just learned about Fliesler Meyer and Karl Kenna --

67

1          THE COURT:  Okay.  All right.  That is a little --

2   if he did say that.

3      What does he say he just learned?

4          MS. RICE:  He says it in his declaration.  It's

5   just shocking.

6          THE COURT:  Have you taken his deposition?

7          MS. RICE:  We would love to, your Honor, but the

8   discovery cutoff had occurred --

9          THE COURT:  All right.

10         MS. RICE:  -- and we just learned about this in

11  preparing Mr. Kenna.

12         THE COURT:  All right.  Look, all right, I'm not

13  going to make a ruling on the merits of either of these

14  today, even though I have tentative views on both.  I am

15  going to -- I want you both to listen carefully.

16     I want you have that meeting on the selective waiver

17  and your meet and confer.  When is that meeting?

18              UNIDENTIFIED SPEAKER:  (Indiscernible.)

19         THE COURT:  Okay.  I want to know the results of

20  that meeting and whether you are coming clean.  Then I'm

21  going to make -- then I'm going to decide whether we have an

22  evidentiary hearing on the disqualification.

23     So I'm not going to decide that right now.  Both sides

24  are going to tell me whether or not you've come clean on

25  what they want before I decide whether you get what you want

68

1  by way of evidentiary hearing.

2      Now, the evidentiary hearing may still not prove what

3  you want it to prove, but you might get the hearing.  But

4  right now, I'm not going to say whether or not you get an

5  evidentiary hearing on it or whether you even deserve one.

6  I want to know the answer to that question first.

7      Okay.  We've been at it an hour and a half.  And thank

8  you for your excellent arguments.

9          MS. RICE:  Thank you, your Honor.

10          THE COURT:  Have a good day.

11          MR. KABA:  Thank you, your Honor.

12          MS. RAYBURN:  Thank you, your Honor.

13          MR. ATKINSON:  Thank you, your Honor.

14      (Proceedings adjourned at 12:31 p.m.)

15

16

17

18

19

20

21

22

23

24

25

69

1  <u>                              CERTIFICATE OF TRANSCRIBER</u>

2

3       I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9       I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14 

15

16       Echo Reporting, Inc., Transcriber

17             Tuesday, April 12, 2022

18

19

20

21

22

23

24

25