UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MASTEROBJECTS, INC.,

    Plaintiff,

v.

AMAZON.COM, INC,

    Defendant.

No. C 20-08103 WHA

**ORDER DENYING MOTION TO DISQUALIFY**

## INTRODUCTION

In this patent-infringement action, patent owner seeks to disqualify alleged infringer's counsel of record because in-house counsel worked at the firm that prosecuted the parent patent of the patents-in-suit. For the reasons that follow, the motion is **DENIED**.

## STATEMENT

Previous orders described our facts (Dkt. Nos. 159, 206). In brief, patent owner MasterObjects, Inc. brought this action against defendant Amazon.com, Inc. in 2020 for infringement of several patents that touch on an asynchronous communication system that can suggest search terms based on the characters a user types into a search bar, *i.e.*, autocomplete or predictive search results (Sec. Amd. Compl. ¶ 8–11). The current motion does not concern the patents-in-suit directly but the prosecution of MasterObjects' patent family.

In 2000, MasterObjects' outside counsel Fliesler Meyer LLP (later Fliesler, Dubb, Meyer & Lovejoy, LLP, both hereinafter "FDML") began preparations to prosecute U.S. Patent No.

1  8,112,529.  Although the '529 patent is not asserted in this litigation, all the patents-in-suit are

2  its descendants and share or incorporate its specification, as illustrated below.  The asserted

3  patents are highlighted in blue, the full line demarcates a continuation of the earlier patent, and

4  the dashed line represents a continuation-in-part:



15  (Dkt. No. 280 at 14).  As indicated, MasterObjects filed the application for what would become

16  the '529 patent on August 20, 2001.  One of the attorneys working at FDML when it filed the

17  application for the '529 patent was Scott Sanford.  Specifically, after graduating from law

18  school, Attorney Sanford joined the firm in October 2000.  He worked at the firm for

19  approximately eighteen months before shifting to O'Melveny & Myers LLP in April 2002

20  (Sanford Decl. ¶¶ 3–4).

21  Attorney Sanford now works at Amazon.  In his in-house counsel role, he works closely

22  with outside counsel Hueston Hennigan LLP and generally oversees this litigation for Amazon.

23  His prior work history did not come to light until a witness in this action, Karl Kenna, flagged

24  the connection to MasterObjects' attorneys during Mr. Kenna's deposition preparation.  FDML

25  was not listed on Attorney Sanford's public-facing resume on his LinkedIn account.

26  MasterObjects interpreted this omission as concealment of a conflict, and moved to disqualify

27  both Sanford and Hueston Hennigan.

28

2

1  This order follows full briefing and oral argument. After the hearing on the motion, an order granted MasterObjects a three-hour deposition of Attorney Sanford (Dkt. No. 341). A further order also instructed MasterObjects to seek out his time records while he worked at FDML (Dkt. No. 343).

**ANALYSIS**

For the reasons that follow, this order concludes that although MasterObjects has raised a non-frivolous concern regarding a potential conflict, the record is not strong enough to warrant disqualification of Attorney Sanford and Hueston Hennigan.

District courts apply state law in determining matters of disqualification. *In re Cnty. of L.A.*, 223 F.3d 990, 995 (9th Cir. 2000). California Rule of Professional Conduct 1.9(b) states:

> A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
>
> > (1) whose interests are materially adverse to that person; and
> >
> > (2) about whom the lawyer had acquired information protected by Business and Professions Code section 6068, subdivision (e) and rules 1.6 and 1.9(c) that is material to the matter;
>
> unless the former client gives informed written consent.[*]

The parties agree that *Adams v. Aerojet-Gen. Corp.*, 86 Cal. App. 4th 1324 (2001), provides our standard. There, the California Court of Appeal held:

> [W]here there is a substantial relationship between the current case and the matters handled by the firm-switching attorney's former firm, but the attorney did not personally represent the former client who now seeks to remove him from the case, the trial court should apply a modified version of the "substantial relationship" test as described in *Ahmanson*. The court's task, under these circumstances, is to determine whether confidential information material to the current representation would normally have been imparted to the attorney during his tenure at the old firm. In answering this question, the court should focus on the relationship, if any, between the attorney and the former client's representation. It should consider any time spent by the attorney working on behalf of the former client and "the attorney's possible exposure to formulation of policy or strategy" in matters relating to the current

---
[*] Asterisks identifying defined terms omitted.

3

> dispute. The court should also take into account whether the attorney worked out of the same branch office that handled the former litigation, and/or whether his administrative or management duties may have placed him in a position where he would have been exposed to matters relevant to the current dispute.

*Id.* at 1340. Where a substantial relationship between the former firm's representation of the client and the current lawsuit has been demonstrated, the attorney bears the burden of proving he had no exposure to confidential information. *Id.* at 1340–41.

Pursuant to the guidance in *Adams*, this order finds the modified substantial relationship test applicable to the instant dispute. A substantial relationship exists between the current litigation and the matters handled by FDML while Attorney Sanford was employed at the firm. At that time, FDML drafted and filed the application that matured into the '529 patent. As discussed, the '529 patent is highly relevant to this litigation. Attorney Sanford, however, states in a declaration he did not personally represent MasterObjects during his tenure at FDML (Sanford Decl. ¶ 8). MasterObjects does not dispute this.

This order must then consider whether confidential information material to the current litigation would normally have been imparted by MasterObjects or the firm to Attorney Sanford during his time at FDML. In this analysis, the reviewing court may apply reasonable inferences and presumptions about the way attorneys work together. *Adams*, 86 Cal. App. 4th at 1340.

*First*, MasterObjects subpoenaed the successor firms and individuals most likely to possess Attorney Sanford's billing entries from his time at FDML. None of these subpoenas resulted in any documents connecting him to MasterObjects (Dkt. Nos. 351, 352). Attorney Sanford also unconditionally asserts: "While at FDML, I did not work on any matters for MasterObjects or Mark Smit" (Sanford Decl. ¶ 8).

*Second*, the size and structure of FDML does not compel the conclusion Attorney Sanford would have received confidential material information regarding MasterObjects during his time at the firm. FDML was a boutique prosecution firm with approximately a dozen attorneys, most of whom worked at the firm's San Francisco office, which occupied two-thirds of a single floor. Further, Karl Kenna — a patent agent at FDML during the

4

relevant period — states that "associates, paralegals, and patents agents were not 'siloed'" with a single partner, and instead would work on a variety of subject matter (Kenna Decl. ¶¶ 4, 6).

Attorney Sanford does not contest the firm's size but does assert: "Partners at FDML were largely siloed from each other, working with associates to service their individual clients. Junior associates were largely tasked specifically to partners with similar expertise" (Sanford Decl. ¶ 7). To this end, Attorney Sanford explains that he had a mechanical engineering background, so his practice focused on "matters related to semiconductors, semiconductor wafer handling systems, medical devices, and other non-software technologies" (*id.* at ¶ 11). He further states he never worked with Karl Kenna or Martin Fleisler, who did work on the prosecution of MasterObjects' patents (*ibid.*).

*Third*, Attorney Sanford's ability to access client files is not dispositive. Attorney Sanford explains that if he was not staffed on a particular matter, he had no reason to access those files (*id.* at ¶¶ 14–15). He further explains that FDML would have all-hands meetings, but that they concerned "presentations of public developments in the law, such as recent case opinions that would impact how patent attorneys should draft claims" (*id.* at ¶ 13).

In contrast, on this point MasterObjects again relies on Mr. Kenna's declaration, where he states that "although there were instances where access to particular client files was restricted, [*e.g.*], those related to specific litigation matters, the firm's attorneys were otherwise generally not restricted from accessing all of the firm's client files. I do not recall a restriction being placed on accessing MasterObjects[']files" (Kenna Decl. ¶ 8). He also states FDML would occasionally have all-hands meetings where updates would be given regarding particular client matters (*id.* at ¶ 9). However, "whether described as *access* to confidential information or as the *opportunity* to acquire confidential information, that factor alone is not a sufficient basis for finding or conclusively presuming that 'confidential information material to the current representation would normally have been imparted to the attorney during his tenure at the old firm.'" *Ochoa v. Fordel, Inc.*, 146 Cal. App. 4th 898, 911–12 (2007) (quotation omitted).

5

*Fourth*, Attorney Sanford's junior status at FDML also counsels against a conclusion he would typically have received MasterObjects' material confidential information. Attorney Sanford worked at FDML his first eighteen months as a practicing attorney. He explains that he thus had no administrative or management responsibilities that would have exposed him to MasterObjects' information (Sanford Decl. ¶ 15). In contrast, the attorney in *Adams* was the *named partner* at his previous law firm prior to joining a new firm and the potential conflict arising. Yet that opinion reversed the trial court's decision to disqualify and remanded for further proceedings. *Adams*, 86 Cal. App. 4th at 1329–30, 1341. This order finds it unreasonable to infer that a junior associate like Attorney Sanford would typically be privy to the confidential information of a client completely unrelated to his fledgling practice such as MasterObjects. "[A]t some point, it ceases to make sense to apply a presumption of imputed knowledge as a lawyer moves from firm to firm." *Goldberg v. Warner/Chappell Music, Inc.*, 125 Cal. App. 4th 752, 762 (2005).

*Fifth*, the deposition of Attorney Sanford conducted after the hearing on this motion does not justify a different conclusion. At several points during the deposition Attorney Sanford testified that he himself raised his connection with Mr. Fliesler and FDML to Amazon's outside counsel Hueston Hennigan. (Sanford Dep. 92, 104, 107, 110, Dkt. No. 342-2). For example:

> Q. You finally told your lawyers, in January 2022, after we raised the issue; right?
>
> A. I don't recall when I told them.
>
> Q. Did you -- was it before January 2022, sir?
>
> A. I believe so, yes

(*id.* at 104, objections omitted). This contradicts Attorney Sanford's declaration dated February 15, 2022, wherein he stated the "first time I realized that MasterObjects was a client of FDML . . . during the 2001–2002 timeframe was earlier this year, when I learned of MasterObjects threat to disqualify myself and Hueston Hennigan" (Sanford Decl. ¶ 16). After a break during the deposition and a discussion with his lawyers, Attorney Sanford walked back

his testimony: "[S]o I just want to be clear. When we were on a break, I talked to Mr. Kaba real quick, because I felt like I was getting all my dates mixed up. So I told Hueston Hennigan that I worked at Fleisler Myer back in 2000/2002 when you brought up the DQ [disqualification] issue. That was the first time I brought it up to them" (Sanford Dep. 116).

This does undermine Attorney Sanford's credibility somewhat. However, when he first told outside counsel about his former affiliation with FDML has little bearing on the core issue in dispute here — "whether confidential information material to the current representation would normally have been imparted to the attorney during his tenure at the old firm." *Adams*, 86 Cal. App. 4th at 1340. Without more, this contradiction does not lead to the conclusion that Attorney Sanford must be disqualified. This order finds that Attorney Sanford had no access to and did not receive confidential information of MasterObjects during his eighteen months at the law firm. The most convincing point is his own declaration and the absence of more clearcut evidence of access. His credibility is not perfect but it is adequate for these purposes.

In light of the foregoing, this order declines to disqualify either Attorney Sanford or Hueston Hennigan from providing counsel to Amazon on this litigation.

## CONCLUSION

For the foregoing reasons, MasterObjects' motion for disqualification is **DENIED**. This order has considered Amazon's objections to evidence submitted in support of MasterObjects' reply brief. To the extent this order's analysis implicates any evidence to which there was an objection, such objection is overruled. This ruling on Amazon's objections remains within the context of the instant motion and comes without prejudice to any future evidentiary objections.

**IT IS SO ORDERED.**

Dated: June 13, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE