UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MASTEROBJECTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> AMAZON.COM, INC, <br><br> Defendant. | No. C 20-08103 WHA <br><br> **ORDER DENYING AMAZON'S MOTION FOR TERMINATING SANCTIONS** |

**INTRODUCTION**

In this patent-infringement action, alleged infringer accuses patent owner of unclean hands because it purportedly used alleged infringer's confidential information to craft patent claims to cover the alleged infringer's system. For the reasons that follow, the motion is **DENIED**.

**STATEMENT**

Patent owner MasterObjects, Inc. brought this patent-infringement action against defendant Amazon.com, Inc. in May 2020. The patents touch on an asynchronous communication system that can suggest search terms based on the characters a user types into the search bar (Sec. Amd. Compl. ¶¶ 8–11).

This lawsuit, however, is not the first time MasterObjects has claimed that Amazon has infringed its patents on this technology. In 2011, MasterObjects accused Amazon of infringing

U.S. Patent No. 7,752,326 in a lawsuit brought in our district. *MasterObjects, Inc. v. Amazon.com, Inc.*, No. C 11-01055 CRB (N.D. Cal. filed Mar. 7, 2011) (Judge Charles R. Breyer).

That litigation did not progress very far. By June 2011, Amazon's outside counsel Neel Chatterjee (of Orrick, Herrington & Sutcliffe LLP) and MasterObjects' outside counsel William Nelson (of Hosie Rice LLP) began settlement discussions (Chatterjee Decl. ¶¶ 6–10). The parties had not customized their own protective order, so, pursuant to then Patent Local Rule 2-2, "The Protective Order authorized by the Northern District of California shall govern discovery unless the Court enters a different protective order." The parties accordingly relied upon our district's interim model protective order (Rayburn Decl. Exh. 7).

On a call on June 15, 2011, Attorneys Nelson and Chatterjee discussed the high-level structure and capabilities of Amazon's system and whether it employed a system claimed by the '326 patent.

The parties then agreed to participate in a detailed Webex session where Amazon would share documents and an unsworn engineering declaration reflecting technical details of Amazon's accused system (Chatterjee Decl. ¶ 13). That meeting took place on July 19, 2011. It included Attorney Nelson and Attorney Jeff Cox for Amazon (Attorney Chatterjee was away) (*id.* at ¶ 15). By email beforehand, Attorney Chatterjee had requested that the July meeting be deemed confidential, used only for settlement purposes, be protected under Federal Rule of Evidence 408, and not be used in patent prosecution (Chatterjee Decl. Exh. B). Attorney Nelson agreed. The Webex consumed nearly an hour reviewing Amazon's internal documentation (Nelson Decl. ¶ 14; Chatterjee Decl. ¶ 15). The documents included: a declaration from an Amazon engineer describing the system; a primary internal architecture document for the search suggestion feature; and an internal invention disclosure that described the architecture of the search suggestions feature (Hosie Decl. Exh. K). This material contained detailed schematics (*id.* at 2). Counsel took a screenshot of a schematic but otherwise no copies were made of the presentation. Counsel for MasterObjects became persuaded there was no infringement.

1    The day after the meeting, on July 20, Attorney Nelson sent an email proposing that Amazon did not infringe the '326 patent. Attorney Nelson sent that email to: MasterObjects' CEO and named inventor Mark Smit; patent prosecution counsel Martin Fliesler; MasterObjects' consultant William Hassebrock; Attorney Spencer Hosie; and Attorney George Bishop. He explained that Amazon's system did not meet the '326 patent claims (*id.* Exh. J). In August, the parties stipulated to dismissal without prejudice of the 2011 litigation.

Fast-forward to 2020. MasterObjects commenced the instant suit against Amazon on the same technology, this time asserting three new patents filed *after* the parties' 2011 litigation: U.S. Patent Nos. 9,760,629; 10,311,073; and 10,394,866. Amazon asserts that MasterObjects drafted the new claims-in-suit with the benefit of the confidential information conveyed in the 2011 settlement negotiations. For this, Amazon seeks terminating sanctions.

To oppose Amazon's motion, MasterObjects waived privilege for several documents concerning the July 19 meeting. Amazon accused MasterObjects of selective waiver. This accusation was referred to our Special Master Harold J. McElhinny. Pursuant to his guidance, MasterObjects voluntarily produced to Amazon a further two hundred documents. Our Special Master also ordered a handful of additional documents produced to Amazon, reduced some redactions on previously produced documents, and permitted an additional two hours of deposition of Mark Smit (Dkt. No. 340). Notably, our Special Master expressly found no evidence of selective disclosure. Once again, the Court thanks Special Master McElhinny for his excellent work.

This order follows full briefing, a hearing and supplemental proceedings before the Special Master, and a sur-reply.

**ANALYSIS**

Amazon argues that MasterObjects has unclean hands because it allegedly used Amazon's confidential information to prosecute the asserted patents. There is, of course, nothing wrong per se in a patent owner, after a patent has issued, seeking an additional claim based on the original specification, even when it has the specific intent to cover someone's product. The original specification must support the new claim and it must otherwise be valid.

1    But it would be wrong to do so in violation of an agreement barring use of certain information
2    in patent prosecution. The parties agree that the standard of proof requires clear and
3    convincing evidence. *See Gilead Scis., Inc. v. Merck & Co., Inc.*, 888 F.3d 1231, 1239 (Fed.
4    Cir. 2018); *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1375 (Fed. Cir. 2001).

In this diagram of MasterObjects' patent family, the asserted patents are highlighted in blue, full lines demarcate continuations of the earlier patent, and dashed lines represents continuations-in-part:



Amazon notes a "stark difference" between MasterObjects' patent claims that pre-date the 2011 settlement discussions and the patent claims-in-suit that post-date the 2011 discussions between the parties — the '628, '073, and '866 patents (Br. 13). The '529 patent issued in 2012, but the claims were drafted prior to the 2011 litigation.

Amazon argues that the system recited in MasterObjects' pre-2011 patent claims required two different sources of information to generate autocomplete suggestions: a cache and a database of content (Br. 2). For example, claim 1 of the '326 patent recited, in relevant part, a system that:

> automatically matches the increasingly focused query string both
> ***initially*** by matching the query string against the previously
>   determined results stored in the unified query cache at the
>   server, and
> ***subsequently***, if no matching cache entry was found, by matching

4

> the query string against the content sources as retrieved by the server

(Col. 42:22–29, emphasis added). In contrast, Amazon interprets the later patents as reciting a different type of "cache only" system (Dkt. No. 263 at 3). Amazon points to claim 1 of the '866 patent, which recites, in relevant part, a system that:

> match[es], by the server system, the string to entries in a cache of queries and search results previously retrieved from one or more content sources

(Col. 32:65–67). Amazon argues each of the newer claims-in-suit "employs a new 'single cache' strategy on all asserted claims" (Br. 16), all to try to ensnare Amazon's autocomplete system.

For its part, MasterObjects promotes a different taxonomy. It distinguishes between a "two-step" process and a "one-step" process. In a "two-step" process, as per the earlier '326 patent, the system first checked a cache and then, if no matching cache entry was found, the system checked a "content source," *i.e.*, a database of content like a dictionary or a more dynamic data source (Hosie Decl. Exh. E). A "one-step" process, the newer patented process, according to MasterObjects, "does not check an underlying data source on a cache miss" (Opp. 17). MasterObjects asserts it had claimed a "one-step" system long before the party's settlement discussions in 2011, such as claim 1 of the '529 patent.

These competing taxonomies are stalking horses for competing claim constructions yet to be determined. For purposes of this motion, it is best to stick with the facts of what happened and what the parties said and did at the time.

The basic findings herein are that the proffer made on June 15 was not subject to a prosecution bar, that the detailed information provided in the Webex meeting on July 19 was subject to a prosecution bar, and that the record is not clear and convincing that MasterObjects violated the bar. Here is the detailed analysis.

Before any possible confidential disclosure in the 2011 litigation, in an email dated May 26, 2011, MasterObjects' Attorney Spencer Hosie posed the question to his client and team, "how likely is it that amz [Amazon] never goes past the cache? I.E., [sic] checks a cache and stops there, regardless of success?" (Hosie Decl. Exh. C). In a message sent shortly thereafter,

5

he stated this was his own hypothesis unprompted by any statements by Amazon regarding its caching method. He further stated that he believed that other MasterObjects patent claims pending before the PTO did not require a database check (*ibid.*). Amazon had yet to disclose any information to MasterObjects. At this point, Amazon's in-house counsel Andrew Devore had only asked Attorney Hosie for a settlement demand and relayed that he felt Amazon had a strong non-infringement defense (*id.* Exhs. A, B).

Preliminary discussions to settle the 2011 litigation effectively began with a call between Attorneys Nelson (MasterObjects) and Chatterjee (Amazon) on June 15, 2011. On this call, Attorney Chatterjee disclosed the structure of Amazon's autocomplete system and laid out a non-infringement position. Attorney Nelson summarized in an internal email to his partners at Hosie Rice that same day: "They [Amazon] do not perform the two step check of first a cache, then if no content they check another database of content. Per him [Attorney Chatterjee], they check a cache, and if there is a result [sic]. If no result, they do not check any other store for content" (*id.* Exh. E). In another written account of the call sent that same day, Attorney Nelson told his client: "Their [Amazon] primary defense to infringement, as we thought might occur, is that they claim they do not implement a 'two step' content lookup process in providing product search suggestions. According to them, search suggestions reside in a unitary cache, and when text is entered into the search box, that cache and no other content source is accessed. If there is no content in the cache, no other content store is consulted, and no search suggestions are provided" (*id.* Exh. F).

The parties vigorously dispute the degree of restriction Amazon placed on the information disclosed during this call. No use restrictions were put in writing beforehand. Attorneys Nelson and Chatterjee's emails setting up the call only set up the time (Rayburn Exh. 4). Attorney Chatterjee, however, now provides a declaration regarding the calls, where he states:

> It is my practice, where practicable, to ask for a demand early in a case. . . . From the very beginning of these conversations, I confirm that all settlement communications throughout the entire case can only be used for settlement purposes and that the conversations are confidential. I make clear that we are agreeing

6

> to protection broader than Rule 408 insofar as the discussions should not be used for any purpose other than settlement communications. . . . While it was a long time ago, my recollection is that Mr. Nelson and I followed my standard approach to early settlement discussions. Specifically, in our original discussions, Mr. Nelson verbally agreed to the standard terms I use related to settlement discussions

(Chatterjee Decl. ¶¶ 4–5, 7). Attorney Chatterjee focuses at length on his usual habit and custom. He then states "while it was a long time ago, my recollection is that Mr. Nelson and I followed my standard approach to early settlement discussions." This is a weak recollection. The follow-on sentence beginning with "Specifically, . . ." is conclusory and modified by the weak recollection. This lawyer-drafted testimony boils down to "it was a long time ago and I believe I would have followed my usual habit and custom, so my memory of it now is informed by that habit and custom and so my best recollection after so much time is that Attorney Nelson agreed to follow my usual habit and custom."

In contrast, Attorney Nelson submits a much more "specific" recollection of the same discussions:

> I believe I recall better the specifics of our discussions in connection with this case than Mr. Chatterjee does . . . . Prior to his July 14, 2011 email to me, which I discuss below, Mr. Chatterjee never asked me to treat the information provided in our settlement discussions as anything other than Rule 408 communications. Specifically, I disagree that Mr. Chatterjee ever asked me to treat information he provided to me prior to July 14, 2011 as "confidential", subject to a prosecution bar, or otherwise subject to a protective order. He did not do so. While I do not remember the specific words used before our substantive conversations, either he or I would say something like, "Hey, is this a Rule 408 conversation?" and the other would respond, "yes"

(Nelson Decl. ¶¶ 4–5). Attorney Nelson unconditionally declares: "The information had been provided to me without restriction apart from Rule 408" (*id.* at ¶ 7).

Attorney Nelson provides a more particularized, less equivocal statement than Attorney Chatterjee. His contemporaneous writings about the discussions also support his conclusion. They also only reference Rule 408 (Hosie Decl. Exhs. D, E, G). Indeed, Nelson sent one of those contemporaneous writings over to Amazon. In bold and all caps, it labeled the message

7

(sent via email and U.S. mail) "RULE 408 SETTLEMENT COMMUNICATION" (*id.* Exh. G). Despite only referencing Rule 408, Amazon did not protest or clarify.

Remember, as stated above, based on the June 15 call, Attorney Nelson described Amazon's system to his client as having a "unitary" one-step cache that did not access any other content source.

For the June 15 call there was no documentation of a confidentiality designation under any protective order (assuming for the sake of argument only that the June 15 call constituted a "disclosure" or "discovery" within the meaning of the Rule).

In preparation for the July Webex, however, both sides documented a confidentiality agreement. By email, Attorney Nelson explicitly confirmed to Attorney Chatterjee that the upcoming document review and discussion would be confidential, would not be used in prosecution, and would only be used for settlement conversations.

Contrary to Amazon, however, that agreement was not retroactive to include the June 15 telephone call. Attorney Chatterjee's confirmation email simply referred to "our discussions" being so treated (Chatterjee Decl. Exh. B). In context, that referred to the discussions contemplated in the Webex meeting and any follow-ups. In short, Amazon has failed to demonstrate it imposed any restrictions on the pre-Webex June 15 telephone call other than Rule 408. Without question, however, the details in the Webex conference on July 19, 2011, were encumbered by a specific patent prosecution bar. This was by mutual agreement and is not disputed.

After the Webex meeting, Attorney Nelson produced a detailed memo for his colleagues at Hosie Rice (Hosie Decl. Exh. K). Of more concern here, he also sent a less-detailed summary email to his client recommending voluntary dismissal of the action against Amazon. The critical paragraphs of the July 20 client email follow:

> While I cannot share with you the details, I can provide my high level conclusions. First, whatever there is to say about the declaration, the two internal documents appeared to be legitimate; there was every indication that they were in fact what they appeared to be – internal documents that predate the litigation. More fundamentally, accepting what they say as true, the Amazon autocompletion service utilizes a single (compiled daily) in-

8

>memory database to store query suggestions (from 50M to 100M suggestions) keyed to various partial and complete queries. As Mark had thought, this single database is replicated in its entirety across many servers, and a load balancing implementation directs user inputs to one of them. If no matching result is found in the in-memory database, an empty set is returned to the client. There is no other lookup for possible matching content at this time, though some appears to be at least contemplated for the future. As such, our conclusion is that this implementation as it exists currently does not meet the '326 claims, in particular the requirement of first 1) checking the query and result cache, and then 2) checking another content source if no matching results are found in step 1).
>
>However, there is another function that arguably infringes the claims of the (hopefully) soon to be allowed continuation patent, which describes "automatically match[ing] the increasingly focused query string initially by matching the query string against the contents of the query and result cache, and subsequently by matching the query string against other content available to the server," since before results are returned to the client, the completion server consults another in-memory table (not a table of queries and results) and performs certain actions depending on what is retrieved. However it is a limited implementation and may well be susceptible to a design-around

(*id.* Exh. J).

In the Court's view, the July 20 email revealed very little beyond what had been disclosed on June 15. Amazon insists, however, that counsel's July 20 email revealed additional details about Amazon's system beyond those learned on June 15, specifically how: "(1) Amazon's autocomplete uses a database that is 'in-memory' and 'compiled daily' (i.e., pre-built); (2) the database is 'keyed to various partial and complete queries'; (3) the database stores 'from 50 M to 100M [autocomplete] suggestions'; or (4) additional lookups were being considered for the future" (Reply Br. 4). Amazon also notes that Attorney Nelson's email referenced another Amazon system function wherein the system consults another in-memory table (*id.* at 5), although that had only been by way of saying that system would be covered by a then pending continuation patent.

Amazon does not convincingly explain, however, how this incremental information was used to prosecute the later patent claims. Amazon, for example, traces none of this incremental information into any of the claims-in-suit. Nor does Amazon explain how knowledge of these features, without more, would give MasterObjects an unfair advantage in this litigation that is "offensive to the dictates of natural justice." *Aptix*, 269 F.3d at 1375. Put differently,

9

MasterObjects was free to use the high-level information from the June 15 telephone call, information that MasterObjects already suspected might be the case. This raises the question what exactly was the significance of the further information in the July 20 client email that was not already known to MasterObjects? In the Court's view, since MasterObjects could freely use the June 15 proffer, nothing was significant about the July 20 email other than to confirm the June 15 proffer.

Possibly those incremental details crept into the thinking of the patent prosecutors, but, if so, those lower-level details would have been of lesser consequence than the higher-level features already available for unrestricted use. This record and scenario are not sordid enough to warrant the drastic relief of tossing out an entire lawsuit. *See Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944); *Gilead*, 888 F.3d at 1239; *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (discussing unclean hands).

Amazon cites a claim amendment dated January 28, 2019, for the application that became the asserted '866 patent which recites, in relevant part: "matching, by the server system, the string to entries in a cache of queries and search results ~~based on earlier search queries received from a plurality of users~~ <u>previously retrieved from one or more content sources</u>" (Rayburn Decl. Exh. W). But why the need for an amendment in the first place? Under Amazon's theory, MasterObjects had improper insight into Amazon's system since 2011, and MasterObjects did not file the application for the '866 patent until five years later, on December 22, 2016. Presumably, MasterObjects would have targeted Amazon's system from the get-go. Once again, this contains none of the specific information shared in the July 2011 Webex meeting, just (at most) recognition of the basic structure of Amazon's system previously disclosed.

Amazon also refers to a draft response to the patent examiner for abandoned U.S. Patent Application No. 12/176,984. In an email dated March 12, 2015, Mark Smit (MasterObjects' CEO and named inventor) told prosecution counsel:

> I appreciate your suggestion to add the "hit or miss" caching algorithm, but if we narrow our claim down to that, we may exclude systems from potential infringers who use a single 'mined'

10

> dataset for the query and result cache based on prior user queries. We do not want to do that (in fact, I think our '326 patent had a similar limitation that ended up forcing us to retreat from our case to Amazon!)

(Rayburn Decl. Exhs. S, T). MasterObjects abandoned this entire application, so this quotation carries little significance. Smit's commentary, moreover, only reflects his desire to claim a "one-step" system rather than a "two-step" that checks a content source on a cache miss. Smit's edits to the underlying prosecution document reflect this same objective. He wrote that "raw data could perhaps be mined to create a query and result cache as described in the present invention" (Rayburn Exh. S). But this does not clearly and convincingly demonstrate Smit was considering the fact that Amazon's system was "in-memory," "compiled daily," or any of the other details provided in the July 2011 Webex meeting.

Contrary to Amazon, there is no smoking gun in MasterObjects' internal correspondence or Smit's deposition testimony. In a document titled "Amazon Product Search" dated September 24, 2018, Smit opined after quoting claim 7 of the '024 patent: "When Amazon [sic] first filed suit against Amazon based on its '326 patent, I believe Amazon indicated that all suggestions are returned from a 'static' cache that is built on a daily basis. It is not clear how this daily cache is built. If the cache is based on prior user queries (rather than some other criterion), then claim 7 could be infringed" (Rayburn Exh. V).

It's true that this referred to the daily-build aspect of the Amazon system and that the daily-build point was referenced in the July 20 summary (not on June 15). Nevertheless, the daily-build feature had nothing to do with the point being made, namely that claim 7 would cover a cache built from prior user queries. MasterObjects no longer asserts any claim from the '024 patent.

In his deposition, Smit testified:

> Q. Is it fair to say at least one of the purposes of drafting the new claims of -- that resulted in the patents in suit was to not have the same problem that, quote, enabled Amazon to get out of infringement, unquote?
>
> A. I think that's fair to say

1  (Smit Dep. 29, Hosie Decl. Exh. N, Rayburn Decl. Exh. 1 (objection omitted)).  Nevertheless,
2  "there is nothing improper, illegal or inequitable in filing a patent application for the purpose
3  of obtaining a right to exclude a known competitor's product from the market; nor is it in any
4  manner improper to amend or insert claims intended to cover a competitor's product the
5  applicant's attorney has learned about during the prosecution of a patent application."
6  *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988)
7  (evaluating inequitable conduct).  Wanting to sue Amazon is not the same thing as misusing
8  restricted information.

At first blush, that the summary went to Attorney Martin Fliesler is most concerning.  He (or his firm) remained the patent prosecution attorney on all patents relevant herein.  Anything he received would be most likely considered in future patent prosecutions.  That it was even sent to him indicates an intent that he do so.  True, Attorney Fliesler was also on the board of MasterObjects, so arguably he received the summary wearing a director hat, but that would be splitting hairs.  But, the summary contained nothing of significance beyond what MasterObjects and patent counsel had already learned in the unprotected June 15 call.  In short, the June 15 call was the proffer and the July 19 Webex was the proof.  The summary did little more than say the Webex had substantiated the June 15 proffer.

The coup de grâce for this motion is Amazon's insistence that the new claims still fail to cover its system.  It asserts:

> To be clear, Amazon believes that MasterObjects' current claims require the ability to query both a cache and an underlying content database, as explained at length in Amazon's claim construction brief.  But it is also apparent that, after learning Amazon's confidential information, MasterObjects attempted to craft patent claims to obfuscate (though it was unable to eliminate) that requirement

(Reply Br. 7 n.3).  Amazon analogizes to *Gilead*, where Merck's patent-prosecution counsel substantively narrowed broad genus claims to a subgenus focused on the key features of a compound whose structure was disclosed to counsel under a specific use restriction.  Gilead considered the compound's structure its "crown jewel," and, critically, *stipulated to*

*infringement* in light of these claim amendments. 888 F.3d at 1233, 1241–42. Here, as stated, Amazon has made no similar concession of infringement.

In sum, Amazon has failed to meet its burden of demonstrating by clear and convincing evidence that MasterObjects has unclean hands that warrant dismissal of this action.[*]

**CONCLUSION**

For the foregoing reasons, Amazon's motion is **DENIED**.

The parties have filed extensive briefing regarding whether material related to this motion should be sealed. Isn't all the information in this order stale? To that end, this order will remain under seal for **FOURTEEN DAYS**, after which it will be unsealed and filed on the public docket in its entirety unless one or more parties move to keep specific portions of the order under seal, explain why, and the motion is granted.

**IT IS SO ORDERED.**

Dated: June 14, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[*] One of the curiosities in this fact pattern concerns the fact that Attorney Nelson, in his July 20 client summary, stated he could not share the details with his client but could only provide a high-level analysis. Where did this restriction come from? It didn't come from the ground rules for the Webex meeting, for while those ground rules required confidentiality, they did not restrict the information to counsel only. The client could have had full access. Nor did it flow from the fact that the recipients had not yet signed on to the protective order, for the Webex session did not constitute "discovery" or "disclosure" and thus the protective order had no applicability. Rather, as Attorney Nelson attests, this was a caution he took upon himself, perhaps seeing into the future a day like the present one (Nelson Decl. ¶ 14).