1  Moez M. Kaba, CA State Bar No. 257456
   mkaba@hueston.com
2  Rami Bachour, CA State Bar No. 324844
   rbachour@hueston.com
3  Julia Haines, CA State Bar No. 321607
   jhaines@hueston.com
4  HUESTON HENNIGAN LLP
   523 West 6th St., Suite 400
5  Los Angeles, CA 90014
   Telephone:    (213) 788-4340
6  Facsimile:    (888) 775-0898

7  Douglas J. Dixon, CA State Bar No. 275389
   ddixon@hueston.com
8  Christina V. Rayburn, CA State Bar No. 255467
   crayburn@hueston.com
9  Neil G. Anderson, CA State Bar No. 307668
   nanderson@hueston.com
10 Thomas B. King, CA State Bar No. 241661
   tking@hueston.com
11 Justin Sorensen, CA State Bar No. 324817
   jsorensen@hueston.com
12
   HUESTON HENNIGAN LLP
13 620 Newport Center Drive, Suite 1300
   Newport Beach, CA 92660
14 Telephone:    (949) 229-8640
   Facsimile:    (888) 775-0898
15
   Attorneys for Defendant
16 AMAZON.COM, INC.

17                  UNITED STATES DISTRICT COURT

18                 NORTHERN DISTRICT OF CALIFORNIA

19                  SAN FRANCISCO COURTHOUSE

20 | MASTEROBJECTS, INC., | Case No. 3:20-cv-08103-WHA |

21 |        Plaintiff, | Judge William Alsup |

22 |        vs. | Courtroom: 12 |

23 | AMAZON.COM, INC., | **DEFENDANT AMAZON.COM, INC.'S NOTICE OF MOTION AND COMBINED** |

24 |        Defendant. | **MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE PLAINTIFF MASTEROBJECTS' INFRINGEMENT** |

25 | | **EXPERT** |

26 | | Date: September 8, 2022 |
27 | | Time: 8:00 a.m. |
   | | Complaint Filed: May 5, 2020 |
28 | | Trial Date: October 17, 2022 |

1    **<u>NOTICE OF MOTION AND MOTION</u>**

2    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3    **PLEASE TAKE NOTICE** that on September 8, 2022, at 8:00 a.m., or as soon thereafter as

4    the matter can be heard in the courtroom of the Honorable William Alsup, located at Courtroom 12

5    of the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant

6    Amazon.com, Inc. ("Amazon") will, and hereby does, move the Court, *first*, to exclude the

7    infringement expert opinion of Mr. John  Peck, submitted on behalf of Plaintiff MasterObjects, Inc.

8    ("MasterObjects" or "MO"), and *second*, for summary judgment of non-infringement.

9    This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and

10   Authorities in support thereof, the pleadings and papers on file in this action, any other such matters

11   upon which the Court may take judicial notice or which are incorporated by reference, the arguments

12   of counsel, and any other matters that the Court may properly consider.

13

14   Dated: July 28, 2022                                Respectfully submitted,

15                                                       HUESTON HENNIGAN LLP

16                                                       By: */s/ Christina V. Rayburn*
                                                             Christina V. Rayburn
17

18                                                       Attorneys for Defendant Amazon.com, Inc.

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................................... 1

II.  LEGAL STANDARDS ............................................................................................ 2

III. OVERVIEW OF MASTEROBJECTS' PATENTS-IN-SUIT ................................. 3

IV.  OVERVIEW OF AMAZON'S ACCUSED SYSTEM .......................................... 5

V.   MASTEROBJECTS' INFRINGEMENT EXPERT'S ANALYSIS SHOULD
     BE EXCLUDED AS UNRELIABLE .................................................................... 7

     A.   Background of MasterObjects' Infringement Allegations ......................... 8

     B.   Mr. Peck's Report Improperly Duplicates MasterObjects'
          Infringement Contentions and Masks Counsel's Statements as His
          Own .......................................................................................................... 8

     C.   Mr. Peck's Report is Based on Unreliable and Irrelevant
          Information .............................................................................................. 12

          1.   Mr. Peck's Opinion Adopts Tests Performed by an
               Unidentified Person ..................................................................... 12

          2.   Mr. Peck Based His Opinion on Irrelevant Information ............. 13

          3.   Mr. Peck Is Wrong About How Amazon's System Works ......... 14

          4.   Mr. Peck Did Not Properly Apply Either Party's Proposed
               Claim Constructions, or the Ordinary Meaning of the
               Remaining Claim Terms .............................................................. 15

VI.  SUMMARY JUDGMENT IS APPROPRIATE .................................................... 15

     A.   Summary Judgment is Appropriate if Mr. Peck is Excluded ................. 15

     B.   Summary Judgment is Appropriate Even if Mr. Peck is Not Excluded ... 16

          1.   Summary Judgment is Appropriate Because Amazon Does Not
               Practice the "Caching" Claim Limitations, As MasterObjects
               Has Defined Them ....................................................................... 16

               a)   MasterObjects Has Conceded that the Claimed
                    "Cache" Must Contain Prior Queries and Prior Query
                    Results .............................................................................. 16

               b)   MasterObjects Cannot Show That Amazon's
                    Autocomplete System Has A Cache of Prior Queries or
                    Prior Query Results .......................................................... 17

Case No. 3:20-cv-08103-WHA
AMAZON MSJ/MOTION TO EXCLUDE

1

<u>TABLE OF CONTENTS</u> (cont'd)

2                                                                                                    <u>Page</u>

3          c)    <u>Amazon's Experts Show That Amazon Does Not</u> ███
               ███████ Using Prior Autocomplete Queries or Prior
4               Autocomplete Results ................................................................ 18

5          d)    MasterObjects'   Conclusory   Expert   Testimony
               Regarding Caching Does Not Create A Triable Issue of
6               Fact ............................................................................................. 20

7     2.   Summary Judgment is Appropriate Because MasterObjects
          Cannot Show Infringement of the "Caching" Limitations
8          Under Amazon's Constructions ................................................... 22

9     3.   Summary Judgment is Warranted Because Amazon Does Not
          Practice the "Asynchronous" Limitation Under Any Proposed
10         Construction ................................................................................. 23

11    4.   Summary Judgment is Appropriate Because Amazon Does Not
          Practice the "Query Messages" Limitations Under Amazon's
12         Proposed Construction ................................................................. 25

13  VII.   CONCLUSION .............................................................................. 25

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6138919

1
2

# TABLE OF AUTHORITIES

3

Page(s)

4

**Cases**

5
*Accentra Inc. v. Staples, Inc.*,
  2010 WL 11459205 (C.D. Cal. 2010) ............................................................... 11

6
*Anderson v. Liberty Lobby, Inc.*,
7
  477 U.S. 242 (1986) ........................................................................................... 3

8
*AquaTex Indus., Inc. v. Techniche,*
  *Sols.*, 479 F.3d 1320 (Fed. Cir. 2007) ............................................................... 16
9

10
*ASK Chemicals, LP v. Computer Packages, Inc.*,
  593 Fed.Appx. 506 (6th Cir. Dec. 10, 2014) ..................................................... 11

11
*Callahan v. PeopleConnect, Inc.*,
12
  No. 20-CV-09203-EMC, 2022 WL 2132912 (N.D. Cal. June 14, 2022) .......... 25

13
*Camarillo v. McCarthy*,
  998 F.2d 638 (9th Cir. 1993) ............................................................................. 25
14

15
*Cellspin Soft, Inc. v. Fitbit, Inc.*,
  No. 4:17-cv-05928-YGR, 2022 WL 2784467 (N.D. Cal. June 7, 2022) ............ 3

16
*Centricut, LLC v. Esab Grp., Inc.*,
17
  390 F.3d 1361 (Fed. Cir. 2004) ......................................................................... 16

18
*Dreyer v. Ryder Auto. Carrier Grp., Inc.*,
  367 F. Supp. 2d 413 (W.D.N.Y. 2005) .............................................................. 13
19

20
*Forte v. Liquidnet Holdings, Inc.*,
  675 F. App'x 21 (2d Cir. 2017) ......................................................................... 13

21
*General Elec. Co. v. Joiner*,
22
  522 U.S. 136 (1997) ........................................................................................... 21

23
*Guidroz-Brault v. Mo. Pac. R.R. Co.*,
  254 F.3d 825 (9th Cir. 2001) ............................................................................... 2

24
*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
25
  524 F.Supp.2d 1166 (N.D. Cal. 2007) ............................................................... 14

26
*In re Jackson Nat'l Life Ins. Co. Premium Litig.*,
27
  2000 WL 33654070 (W.D. Mich. Feb. 8, 2000) ............................................... 11

28
*Ledo Fin. Corp. v. Summers*,
  122 F.3d 825 (9th Cir. 1997) ............................................................................. 25

- iii -

*Lust By and Through Lust v. Merrell Dow Pharms., Inc.*,
    89 F.3d 594 (9th Cir. 1996) ................................................................................. 3

*Markman v. Westview Instruments*,
    517 U.S. 370 (1996)........................................................................................... 16

*Mitchell v. Geo Grp. Inc.*,
    2022 WL 874287 & n.3 (D. Ariz. Mar. 24, 2022)............................................. 17

*Munoz v. Orr*,
    200 F.3d 291 (5th Cir. 2000) ............................................................................ 13

*Numanics, Inc. v. Balluff, Inc.*,
    66 F.Supp.3d 934 (E.D. Mich. 2014) ............................................................... 11

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................................ 15

*S.E.C. v. Daifotis*,
    No. C 11-00137 WHA, 2012 WL 2051193 (N.D. Cal. June 7, 2012) ............... 12

*Sundance, Inc. v. Demonte Fabricating Ltd.*,
    550 F. 3d 1356 (Fed. Cir. 2008) ......................................................................... 2

*Teradata Corp. v. SAP SE*,
    570 F.Supp.3d 810 (N.D. Cal. 2021) ................................................................ 22

*Therasense, Inc. v. Becton, Dickinson and Co.*, No. C,
    04-02123 WHA, 2008 WL 2323856 (N.D. Cal. 2008) ..................................... 12

*Treehouse Avatar LLC v. Valve Corp.*,
    Case No. 2:17-cv-01860-RAJ, 2021 WL 4503453 (W.D. Wash. Oct. 1,
    2021)................................................................................................................. 15

*Woods v. City of Hayward*,
    Case No. 19-cv-01350-JCS, 2021 WL 4061657 (N.D. Cal. Sept. 7, 2021) ........ 3

*Yufa v. TSI Inc.*,
    No. SA CV 12-1614 FMO (JCGx), 2014 WL 11398761 (C.D. Cal. Sept. 22,
    2014)................................................................................................................. 24

**Rules**

Federal Rules of Civil Procedure 56(a) ....................................................................... 3

Federal Rules of Civil Procedure 702 ................................................................ *passim*

- iv -

**TABLE OF EXHIBITS/DECLARATIONS**

| Document | Description |
|---|---|
| Anderson Declaration | Declaration of Neil G. Anderson ISO MSJ/Motion to Exclude |
| Miller Declaration | Declaration of Grant Miller ISO MSJ/Motion to Exclude |
| Exhibit A | Excerpts of May 27, 2022 Expert Report of John Peck |
| Exhibit B | Excerpts of June 20, 2022 Deposition of John Peck |
| Exhibit C | May 27, 2022 Declaration of Trevor Smedley |
| Exhibit D | Excerpts of June 28, 2022 Deposition of Trevor Smedley |
| Exhibit E | Excerpts of July 13, 2022 Expert Report of Don Turnbull, Ph. D., Regarding Noninfringement |
| Exhibit F | Excerpts of slides served with July 13, 2022 Expert Report of Don Turnbull, Ph. D., Regarding Noninfringement |
| Exhibit G | Source Material Analysis for May 27 Expert Report of John Peck |
| Exhibit H | Excerpts of MO_065526 – June 16, 2011 email from counsel to Mark Smit |
| Exhibit I | Excerpts of MO_065574 – June 11, 2011 email from Mark Smit to counsel |
| Exhibit J | Excerpts of MasterObjects, Inc.'s List of Issues on Which it Will Offer Any Expert Testimony in its Case-in-Chief (Including from Non-Retained Experts) |
| Exhibit K | Excerpts of Boteanu et al., "Subjective Search Intent Predictions using Customer Reviews," *available at* https://www.amazon.science/publications/subjective-search-intent-predictions-using-customer-reviews |
| Exhibit L | U.S. Patent No. 9,769,628 |
| Exhibit M | U.S. Patent No. 10,394,866 |
| Exhibit N | U.S. Patent No. 10,311,073 |
| Exhibit O | Excerpts of July 25, 2022 Deposition of John Peck |

1    **<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

2    **I.      INTRODUCTION**

3          Early in this case, Amazon told MasterObjects ("MO") and this Court that it does not practice

4    the "cache" limitations of the Patents-in-Suit. ECF 119 at 22:6-12.  Amazon was right.  After serving

5    five sets of infringement contentions and two technical expert reports, MO still does not have a

6    comprehensible infringement theory as to those limitations.  MO's technical expert reports identify

7    multiple supposed "caches" across Amazon's accused system, without explaining which allegedly

8    practices the claim limitations, or why.  During deposition, MO's infringement expert, Mr. John

9    Peck, stated that his infringement theory relies on only one such "cache."  But even that alleged

10   "cache"—in addition to not being a "cache" at all—does not store the information that MO now

11   concedes is required by the patent claims.  As explained below, Mr. Peck's assertion that it does is

12   based on his misunderstanding of Amazon's system.

13         Mr. Peck can read source code and "primarily do[es] source code review on cases like this."

14   *See* Ex. B at 36:5-13.  The reason he misunderstands Amazon's software is simple: he did not review

15   source code for this case.  Instead, he based his infringement opinion on snippets of: (1) Amazon

16   documents, including documents from outside the damages period and documents describing ideas

17   that were never implemented; and (2) deposition testimony.  While another MO expert, Mr. Trevor

18   Smedley, reviewed Amazon's source code, he prepared only a high-level summary of that review,

19   and there is nothing connecting his summary to the claim language.  *See* Ex. C.  Mr. Peck's report

20   largely addresses Mr. Smedley's analysis in a single sentence: "My understanding per Mr. Smedley's

21   source code analysis supports in full MasterObjects' infringement case."  Ex. A ¶ 372.  Mr. Peck

22   never discussed Mr. Smedley's analysis with Mr. Smedley, Ex. B at 11:23-12:6, and he first received

23   Mr. Smedley's summary on the day his own report was due, *id.* at 93:16-25.  In this software case,

24   Mr. Peck's dismissal of the source code does not constitute a reliable analysis, reliably applied to the

25   facts of the case.  *See* ECF 206 at 4 ("Even if pinpoint citations to source code are not *per se* required,

26   MasterObjects has readily acknowledged source code is critical here.").

27         This is especially so because the document and deposition snippets on which Mr. Peck relies

28   were selected for him by counsel.  Mr. Peck copied-and-pasted almost the entirety of his report from

- 1 -

1   MO's infringement contentions.  The only real difference between MO's contentions and Mr. Peck's

2   infringement theory is that Mr. Peck *deleted* from his report the "pinpoint citations" that this Court

3   had ordered MO to include in its contentions.  Mr. Peck's report thus does not even meet the standard

4   for *contentions* in this district, and it certainly does not satisfy Rule 702.  It should be excluded.

5       If Mr. Peck's infringement report is excluded, summary judgment of non-infringement is

6   appropriate because MO will have no evidence on which to base its infringement claim.  But, even

7   if Mr. Peck's opinion is not excluded, summary judgment should be granted because Mr. Peck's

8   testimony cannot create a genuine dispute about whether Amazon practices the Asserted Claims.

9   Notably, Mr. Peck did not render an infringement opinion under Amazon's proposed claim

10  constructions.  As a result, if Amazon wins *any* of its proposed constructions, summary judgment is

11  appropriate.   In this Motion, Amazon addresses three proposed constructions.   First, Amazon

12  addresses two aspects of its proposed constructions for the "cache" limitations of the Asserted

13  Claims.  As to the first aspect, MO conceded, in its Reply Claim Construction Brief, that Amazon's

14  proposal is correct.  As a result, MO cannot show infringement.  Second, Amazon addresses the

15  "asynchronously" claim limitations.  MO cannot show infringement under *either* Amazon's *or* MO's

16  proposed construction, because MO's expert applied neither construction in his analysis.  Finally,

17  Amazon addresses its proposed construction for the "query messages" limitations, showing that MO

18  cannot show infringement under that construction.  For the reasons set forth in Amazon's claim

19  construction briefing, Amazon's proposed constructions as to these claim terms are correct.

20  Accordingly, and as set forth herein, the Court should grant summary judgment of non-infringement.

21  **II.    LEGAL STANDARDS**

22      Under Rule 702, "courts are charged with a 'gatekeeping role,' the objective of which is to

23  ensure that expert testimony admitted into evidence is both reliable and relevant." *Sundance, Inc.*

24  *v. Demonte Fabricating Ltd*., 550 F. 3d 1356, 1360 (Fed. Cir. 2008); *Guidroz-Brault v. Mo. Pac.*

25  *R.R. Co*., 254 F.3d 825, 829 (9th Cir. 2001).  Rule 702 requires that proposed expert testimony:

26  (1) "is based on sufficient facts or data"; (2) "is the product of reliable principles and methods";

27  and (2) "reliably applie[s] the principles and methods to the facts of the case."  "The reliability

28  prong requires the court to act as a gatekeeper to exclude junk science, and grants the court

- 2 -

1   broad latitude not only in determining whether an expert's testimony is reliable, but also in

2   deciding how to determine the testimony's reliability." *Woods v. City of Hayward*, Case No. 19-cv-

3   01350-JCS, 2021 WL 4061657 at *17 (N.D. Cal. Sept. 7, 2021) (cleaned up). "Evidence should

4   be excluded as unreliable if it suffers from serious methodological flaws." *Id.* "It is the

5   proponent of the expert who has the burden of proving admissibility." *Lust By and Through*

6   *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

7          Federal Rule of Civil Procedure 56(a) authorizes summary judgment if "there is no genuine

8   issue as to material fact and the moving party is entitled to judgment as a matter of law." Summary

9   judgment is appropriate unless "there is sufficient evidence favoring the nonmoving party for a jury

10   to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50

11   (1986). "When faced with summary judgment, the non-moving party is obligated 'to identify with

12   reasonable particularity the evidence that precludes summary judgment.'" *Cellspin Soft, Inc. v.*

13   *Fitbit, Inc.*, No. 4:17-cv-05928-YGR, 2022 WL 2784467, at *1 (N.D. Cal. June 7, 2022).

14   **III.    OVERVIEW OF MASTEROBJECTS' PATENTS-IN-SUIT**

15          The Patents-in-Suit are U.S. Patent Nos. 9,760,628 (the "'628 Patent"), 10,394,866 (the "'866

16   Patent"), and 10,311,073 (the "'073 Patent"). The '628 and '866 Patents are both continuations from

17   U.S. Patent No. 8,112,529 (the "'529 Patent"), and they share a specification with that patent (the

18   "Specification"). ECF 252-21 (Turnbull CC Decl.) ¶ 3. The '073 Patent is a continuation-in-part

19   also descending from the '529 Patent, and incorporates that patent by reference. *Id.*

20          The Specification describes a "multi-tier" "information database search and retrieval system."

21   Ex. L at Abstract; *see also* Turnbull CC Decl. ¶¶ 33-39. This search and retrieval system is made up

22   of three main components: (1) a client; (2) a server; and (3) a service. *Id.* At a high level, the "client"

23   is software operating on a user's device. *Id.* A user enters a search query at the "client," to be

24   responded to by the "server." *Id.* The "server," in turn, makes use of the "service," which contains

25   the information that the server searches for and returns to the client. *Id.* An example of a "service"

26   is a "look-up list such as cities or countries in an order form." Ex. L at 7:33-35, 7:59-60. In that

27   example, a user may attempt to enter her home address—including a state—into an online order

28   form. The "client" provides the order form, including a "state" field into which the user types. The

"server" is the technology that gathers results in response to the user's typing. The "service" contains the list of states—stored in a "content engine"— a user may type into the form. *See, e.g.*, *id.* at Figs. 2, 3A-3C. A key recited benefit of "the present invention" was its ability to act "as a standardized gateway to any content engine." *Id.* at 31:14-16.

The Specification states that this three-component structure is useful for "autocomplete." *See* Turnbull CC Decl. ¶¶ 40-43; Ex. L at 16:6-19:63. Returning to the address example, "auto-complete" allows the system to provide the user—as the user types—suggestions of what the user may be trying to type. For example, if a user is typing a state, and starts with "N," the system offers Nebraska, Nevada, *etc. Id.* at Fig. 3A. This aspect of "[t]he invention" allows the "client" to send a "character-by-character string of data to an intelligent server that can be configured to immediately analyze the lengthening string character-by-character and return to the client increasingly appropriate database information as the client sends the string." *Id.* at Abstract. "Autocomplete" suggestions—like all content made available via the invention—originate from the content engines. *Id.* at 13:32-34 ("The Content Engine is the actual source of any content that is made available through the QuestObjects System."); *id.* at 15:52 ("The invention uses Content Engines as a source of strings.");

On top of the three-component structure with autocomplete, the Specification layers the "caching" of autocomplete suggestions. Turnbull CC Decl. ¶¶ 44-49. This is described as an "optimization." Ex. L at 25:67-26:1. "In addition to acting as a standardized gateway to any content engine, the present invention can intelligently cache query results …." *Id.* at 31:14-16. In the address example, when a user enters "N" into the state field, the server gathers from a content engine a list of states starting with "N," and sends that list to the client. Turnbull CC Decl. ¶¶ 45-49. At that point, the server can cache (save a copy of) that list of states (responsive to the "N" query) for future use. *Id.* The next time a user types "N" into the state field, the server can return the responsive list of states from the cache, rather than querying the content engine again. *Id.* If no prior user has ever typed "N" into the state field, then the cache is empty for that query, and a query to the content engine will occur. *Id.*; *see also* Ex. L at 16:30-37. The Specification describes this caching "optimization" in detail, and describes no other form of caching. Turnbull CC Decl. ¶¶ 46-49, 62-63.

Consistent with this disclosure, exemplary Claim 13 of the '628 Patent claims:

- 4 -

A system comprising:

a server system, including one or more computers, which is configured to receive query messages from a client object, the server system receiving and asynchronously responding to the query messages from the client object over a network;

the client object that, while a user is providing input comprising a lengthening string of characters, sends query messages to the server system;

whereby the query messages represent the lengthening string as additional characters are being input by the user; and

wherein the server system, while receiving said query messages, uses the input to query data available to the server system and send return messages to the client object containing results in response to the input;

wherein the server system caches query results and subsequently determines results by looking up the query in said cache so that it can avoid performing a query for the same input on a data source or looking up said query in a second cache.

Ex. L at 33:35-55.  As explained by the Specification and recited by this claim, the claimed server system: (1) receives query messages (comprising "input") from a client object; (2) obtains query results in response to that "input" from "data available to the server system"; (3) sends the query results obtained in response to that "input" to the client object; (4) caches those query results; and (5) subsequently responds to the same query by gathering query results from the cache, so that it can avoid querying elsewhere for that information.  The claimed server system also responds to the query messages "asynchronously," as discussed in more detail below.  Claim 13 of the '628 Patent is the only independent claim of that patent asserted in this case.  Claim 1 of the '866 Patent and Claim 1 of the '073 Patent, the only independent claims asserted for those patents, are similar to Claim 13 of the '628 Patent.  Ex. M at 32:56-33:9, Ex. N at 39:20-46.  In this case, MO has asserted Claims 13, 19, 21, and 22 of the '628 Patent, Claims 1 and 4-8 of the '866 Patent, and Claims 1, 4, and 7-9 of the '073 Patent (together, the "Asserted Claims").  Ex. A ¶ 170.

## IV.   OVERVIEW OF AMAZON'S ACCUSED SYSTEM

MO has accused Amazon's Autocomplete system of infringing its patents.  Amazon's Autocomplete system receives what a user is typing into Amazon's product search bar (*e.g.*, "gol") and, in response, provides suggestions to the user of ways to complete his or her product search, as shown below.  Ex. E ¶¶ 79-82, 86; *see also* Ex. B at 116:11-118:17.  In the below example, rather than continuing to type her search, the user can simply select one of Amazon's suggestions (*e.g.*, "golf balls").  Ex. E ¶¶ 79-82, 90; *see also* Ex. B at 116:11-118:17.  Once the user does so, Amazon renders a new web page showing results corresponding to a "golf balls" product search.   Ex. E

1   ¶¶ 79-82, 91, 93, 95, 97; *see also* Ex. B at 116:11-118:17.

2   

7   A user can also indicate a complete search in other ways.  The user can type her search in full and

8   hit "Enter" on her keyboard, or "Search" on her phone, or click the magnifying glass.  Ex. E ¶¶ 79-

9   80, 125.  Any of these actions will result in Amazon rendering a new web page with product search

10  results.  *Id.* ¶¶ 82, 90-91, 93, 95, 97, 125-126.

11       Amazon is thus running two different query operations through its product search bar.  The

12  first such operation is Autocomplete, which receives incomplete product search queries (*e.g.*, "gol")

13  and automatically returns, as results, lists of suggested product searches.  *Id.* ¶¶ 68-69, 79-82, 125-

14  126.  The second query operation is product search, which receives complete product search queries

15  (*e.g.*, "golf balls") and responds with a new web page showing products for purchase.  *Id.*  Herein,

16  these two different query operations will be referred to as: (1) *Autocomplete* queries and responses;

17  and (2) *product search* queries and responses.  Each of these query operations has its own, distinct,

18  server system.  *Id.* ¶¶ 69, 90, 125-126.

19       MO has identified Autocomplete queries (*e.g.*, "gol") as satisfying the claim limitations

20  relating to the messages that the client sends to the server.  *See* Ex. A ¶¶ 72-75, 89-99, 102-111;

21  Ex. B at 190:5-22.  MO has identified the list of Autocomplete suggestions (*e.g.*, "golf balls," "gold

22  chain") as satisfying the limitations requiring that the server send query results back to the client

23  while the user continues typing.  *See* Ex. A ¶¶ 108-111; Ex. B at 190:23-191:9.  At that point, MO's

24  infringement theory falls apart.  Amazon's Autocomplete system includes nothing like the caching

25  "optimization" described and claimed by the Patents-in-Suit.  Amazon's accused Autocomplete

26  system does not include anything like a "cache" of Autocomplete "query results" sitting between

27  the client and an underlying data source, saving copies of such "query results" as they are gathered

28  from the underlying content source in response to user-typed queries.  Ex. E ¶¶ 155, 242.

6138919

1    The solution described and claimed by MO's patents—with its focus on acting "as a

2  standardized gateway to any content engine," Ex. L at 31:14-16—is too clunky for Amazon's

3  needs.  While MO's system allows users' incomplete queries to access an underlying database to

4  populate the "cache," allowing such access to Amazon's product database would be inefficient,

5  both for Amazon's product database and for fast autocomplete functionality.  Miller Decl. ¶ 5.  So,

6  in the 2007-2008 timeframe, Amazon chose to build a separate Autocomplete database, using a

7  process called the "Daily Build."   That process builds two paired databases by generating

8  Autocomplete queries that a user might type (*e.g.*, "gol"), and pairing them with Autocomplete

9  suggestions: the product searches that such a user might be hoping to perform (*e.g.*, "golf balls").

10  Amazon does not build this "suggestions" database by "caching" prior Autocomplete queries and

11  results.  Ex. E ¶ 70.  Instead, the "Daily Build" affirmatively creates this database every one-or-

12  two days, using prior *completed product searches* to inform what the Autocomplete query results

13  and queries *should be*.  *Id.* ¶¶ 70, 107-111.  In other words, instead of building a "cache"

14  optimization on top of an underlying client-server-service structure, as described and claimed by

15  MO's patents, Amazon builds a new Autocomplete database, generating the Autocomplete queries

16  and results therein from scratch.  In the language and logic of the MO patents, the accused Amazon

17  database is a content source, not a cache, and it is not implemented with a cache in accordance with

18  the Asserted Claims.  Even MO's CEO and named inventor, Mark Smit, admitted this when

19  evaluating Amazon's system: "I don't consider the full suggestions database to be a cache but a

20  'content source'…."  Ex. H (MO_065526); *see also* Ex. I (MO_065574) ("I do not exclude the

21  possibility that, as Amazon says, the suggestions database (which then is the content source) is

22  queried for each and every character typed by each and every user.").

23  **V.    MASTEROBJECTS' INFRINGEMENT EXPERT'S ANALYSIS SHOULD BE
        EXCLUDED AS UNRELIABLE.**

24

25    MO's infringement expert, Mr. Peck, did not reliably apply reliable principles or methods to

     the facts of the case.  He did not do the work of understanding MO's patent claims, understanding

26  Amazon's accused system, and applying the claims to the system.  Instead, he copied-and-pasted

27  MO's contentions into his expert report.  As a result, his report contains numerous fundamental

28  errors.  Mr. Peck's report should be excluded in its entirety as unreliable.

6138919

### A.   Background of MasterObjects' Infringement Allegations

MO has served five sets of infringement contentions in this case.  On November 11, 2021, Amazon moved to strike MO's Second Supplemental Infringement Contentions ("SSICs"), arguing they did not identify how the accused system allegedly practiced the "cache" limitations.  *See* ECF 175.  Among other things, Amazon argued that the SSICs relied, without explanation, on screenshots of various Amazon documents, and that several of those documents did not even describe the accused system.  *Id.* at 13 (eight documents "describe proposed features that were either never implemented or never launched").  The Court granted Amazon's motion, reasoning, *inter alia*, that "lacking more specific source code citations with some level of accompanying explanation, MasterObjects has failed to provide an adequate level of specificity to satisfy [PLR] 3-1(c)."  ECF 206 at 4.

After MO served its Third Supplemental Infringement Contentions ("TSICs"), Amazon requested leave to again move to strike.  Amazon argued that, while the TSICs added "quote[s] from the deposition testimony of Amazon's employees, they [did] not … add the 'more specific source code citations' that the Court required."  ECF 222 at 1.  In response, MO argued that Amazon had not produced enough code.  ECF 223 at 1.  The Court ordered Amazon to produce more code, so that MO could supplement its contentions further.  *See* ECF 234 at 2 (ordering Amazon to produce "additional source code [that] is reasonably necessary for MasterObjects to understand the workings of the allegedly infringing instrumentality and to properly frame its infringement contentions").

 MO's Fourth Supplemental Infringement Contentions ("FSICs") included a new section entitled "SOURCE CODE FILE PATHS AND PINPOINT CITATIONS."  ECF 290 at 3.  Amazon requested leave to move to strike MO's FSICs as well, arguing, *inter alia*, that this new section did not adequately map code to claim limitations.  *Id.*  The Court denied that request, without prejudice to Amazon "raising the issues in summary judgment."  ECF 297.

### B.   Mr. Peck's Report Improperly Duplicates MasterObjects' Infringement Contentions and Masks Counsel's Statements as His Own.

Amazon's accused Autocomplete system is a software system, implemented via source code.  As MO has argued to this Court, the way to show infringement in this case is to review and explain the code.  *See* ECF 119 at 23:21-23 ("These cases are about source code.  We prove our case with pinpoint citations to source code.").  But Mr. Peck, MO's infringement expert, did not review

- 8 -

Amazon's source code, or explain how lines of code corresponded to the Asserted Claims.  Ex. B at

36:5-17.  MO did not ask him to.  *Id.*  Instead, Mr. Peck described the preparation of his infringement

report as follows:

> I received a copy of the infringement contentions.  I reviewed them,
> understood them.  In preparing my report, I copied and pasted materials
> from the infringement contentions into my report.  I made edits and
> additions, as I clarified, and expressed opinions in the report.

*Id.* at 22:22-23:10; *see also id.* at 54:12-55:2, 17:10-18:15 ("worked in conjunction with counsel"

after receiving FSICs).  As Mr. Peck "copied and pasted" from the FSICs, there was no argument

that he chose not to incorporate.  *Id.* at 39:5-40:14.  The only things from the FSICs that he did not

copy and paste were the citations to source code.  *Id.* at 39:5-40:14.  To the extent the FSICs had

citations to code, Mr. Peck *removed* them from his analysis.  *Id.*  He replaced them in his opinion

with the statement: "My understanding per Mr. Smedley's source code analysis supports in full

MasterObjects' infringement case."  Ex. A ¶ 372.  No explanation follows this statement.  *Id.*[1]  Mr.

Peck's infringement opinion thus relies on: (1) the same compilation of screenshots of Amazon

documents from MO's inadequate SSICs; (2) the same deposition testimony from MO's TSICs; and

(3) a sentence stating that someone else's code analysis generically supports "MasterObjects'

infringement case."  Mr. Peck reviewed no information in preparing his opinion other than documents

that counsel provided to him.  Ex. B at 33:9-34:2.

In total, of the 371 paragraphs in Mr. Peck's report, 284 are copied from MO's FSICs, with

only minor wording changes to conform to the structure of an expert report.  Anderson Decl. ¶ 9.

Only 12 paragraphs appear to add—minimally—additional reasoning to an infringement opinion.  *Id.*

Almost all of the remainder are: conclusory statements of conclusions regarding infringement (5);

copied from the Second Amended Complaint ("SAC") or MO's Claim Construction Brief (13); based

on Mr. Peck's understanding from counsel (19); or unrelated to his infringement analysis, such as

---

[1] Mr. Peck testified that he relied on Mr. Smedley's analysis in editing two portions of his report: (1) the sentence supported by footnote 3 on p. 48; and (2) ¶ 202.  Ex. B at 95:18-100:13.  Both those edits reference Amazon caching "query results returned from the ███████"  *Id.*  Mr. Peck explained that his basis for those edits was a cache that lasts one minute.  *Id.* at 100:14-101:18.  He then conceded that he is *not* relying on that cache for his infringement opinion.  *Id.* at 103:3-18.  Thus, the only edits Mr. Peck made to his report in light of Mr. Smedley's analysis are irrelevant to his opinion.

1   his "Personal Background" (38).  *Id.*  Even for the portions of the report that were not copied from

2   elsewhere, it is not clear that Mr. Peck typed those words or formed those opinions.  Mr. Peck refused

3   to say what percent of his report he typed.  Ex. B at 54:15-19.[2]

4          Mr. Peck's lack of involvement with his report is shown by the "typos" therein.  On the front

5   page, and on the last page below his signature, Mr. Peck's company name is listed wrong.  *Id.* at

6   15:18-16:1.  Mr. Peck agreed that counsel made that mistake, and that he missed it in his review.  *Id.*

7   at 106:10-107:15.  Another example is the paragraphs summarizing Mr. Peck's opinion as to each

8   Asserted Patent (some of the few paragraphs not copied from the FSICs).  Each states that Amazon

9   infringes "in [his] opinion and based on [his] review of Amazon's source code."  Ex. A ¶ 172.  But

10  Mr. Peck *did not review* Amazon's source code.  Ex. B at 36:5-17.

11         Aside from the copying and pasting of FSICs, Mr. Peck's testimony about how his report was

12  prepared is perplexing.  He first testified that, other than the portions of the FSICs that he copied, he

13  did "the typing of [his] report" himself, starting "with a blank MS Word document."  Ex. B at 55:16-

14  56:1; *see also id.* at 107:23-108:14.  But then, on further questioning, he indicated that counsel may

15  have typed portions.  *Id.* at 139:24-140:10.  Mr. Peck admitted that 14 paragraphs (beyond those

16  copied from the FSICs) reflected only his understanding from counsel, despite the fact that those

17  paragraphs did not say so.  *See* Ex. B at 60:13-61:2, 137:10-16, 146:4-17, 147:13-148:20, 149:25-

18  151:6, 153:3-155:7, 156:1-3 (re ¶¶ 30, 35, 37, 42, 44, 48-55, 58).  He incorporated those paragraphs,

19  without attribution to counsel, because he had "no reason to believe [they were] incorrect."  *See, e.g.*,

20  *id.* at 138:4-19.  When questioned how a reader could know "which sentences in [his] report are [his]

21  opinion and which sentences … are things [he] learned from counsel," he responded "I'm not sure

22  that as a reader you would know that offhand."  *Id.* at 61:3-12.  Mr. Peck further admitted that he did

23  not recall how several such paragraphs got into his report.  *See, e.g.*, Ex. B at 139:24-140:5 ("Q. …

24  [Y]ou don't know whether this paragraph, paragraph 30, got into your report because counsel typed

25  it in or because you copied it from some other document provided by counsel …? … A. Yeah, I don't

26  recall.");  *id.* at 149:18-19 ("Q. Did you write this paragraph?  A. I don't recall.");  *id.* at 156:15-17

27  _____

28  [2] Relatedly, Mr. Peck claimed that he "typed" his invalidity report, Ex. O at 10:14-17, but then could
    not confirm that he typed more than 5% of the words in that report, *id.* at 18:5-19:3.

6138919

1   (same).  For other paragraphs, Mr. Peck claimed that they were copied from the FSICs when they

2   were not.  *See* Ex. B at 146:18-147:8 (re ¶ 43), Anderson Decl. ¶ 10; *cf.* 137:10-140:10.

3       Mr. Peck never mentioned copying from MO's Claim Construction Brief or from the SAC,

4   despite at least 13 paragraphs of his report reflecting such copying.  Anderson Decl. ¶ 11.  Indeed,

5   on redirect, MO's counsel appeared to be trying to tell Mr. Peck that he had copied from the SAC,

6   but Mr. Peck denied it.  *See* Ex. B at 246:20-247:10.  In any event, his report should be excluded.

7   *See In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 2000 WL 33654070, *1-2 (W.D. Mich. Feb. 8,

8   2000) (affirming the exclusion of an expert under Rule 37 where "the language of [his] report,

9   including the formulation of his opinions, was not prepared by him, but was provided to him by

10  plaintiffs' counsel," and he "gave incomplete and misleading answers to legitimate questions

11  concerning the authorship of his report").

12      In working with counsel to copy from MO's FSICs and other documents—rather than

13  developing his own infringement analysis and opinion—Mr. Peck impermissibly became a mere

14  parrot for counsel.  *See Numanics, Inc. v. Balluff, Inc.*, 66 F.Supp.3d 934, 941-946 (E.D. Mich. 2014)

15  (excluding expert whose report was drafted by counsel, where expert made "fairly minor" changes

16  and otherwise adopted the attorney's report, because the expert "did not furnish a report that even

17  approximated his original work in this case") (gathering cases).  By *starting* with the infringement

18  contentions, and then adopting the arguments therein as things he "understood," Ex. B at 54:12-55:2,

19  Mr. Peck violated the principle that "[a]n attorney cannot … simply draft the report without prior

20  substantive input from an expert and ask the expert to approve and sign the report."  *Accentra Inc. v.

21  Staples, Inc.*, 2010 WL 11459205, *5 (C.D. Cal. 2010); *see also ASK Chemicals, LP v. Computer

22  Packages, Inc.*, 593 Fed.Appx. 506, 510 (6th Cir. Dec. 10, 2014) ("Where an expert merely offers

23  his client's opinion as his own, that opinion may be excluded.").  Mr. Peck's report should thus be

24  excluded under Rule 702, because he did not apply a reliable analysis to the facts of the case.  For

25  the same reason, his expert report should be excluded under Rule 37, for violating Rule 26's

26  requirement that an expert report be "*prepared* and signed by the witness."  *Numanics*, 66 F.Supp.3d

27  at 941-946 (emphasis added) (gathering cases).  This is particularly so because Mr. Peck's report

28  additionally violates the principle that "an expert may be allowed to state an opinion on the actual

- 11 -

1   matter in controversy where the opinion clearly identifies what is *assumed* versus what is opinion."

2   *S.E.C. v. Daifotis*, No. C 11-00137 WHA, 2012 WL 2051193, at *3 (N.D. Cal. June 7, 2012).  As

3   Mr. Peck has admitted, the way his report was prepared and worded leaves the reader with no way

4   of knowing which paragraphs reflect his opinion, and which merely reflect his understanding from

5   counsel.  Ex. B at 61:3-12.  This is not reliable or permissible expert testimony.

6         **C.**    **Mr. Peck's Report is Based on Unreliable and Irrelevant Information.**

7        As a result of Mr. Peck's uncritical adoption of MO's FSICs, his infringement report is based

8   on information that an expert preparing his own analysis would not have used.  By using irrelevant

9   and unreliable information, Mr. Peck did not reliably apply reliable methods to the facts of the case.

10  FRE 702.  Taken together, there can be no question that Mr. Peck's report should be excluded.

11           *1.*    *Mr. Peck's Opinion Adopts Tests Performed by an Unidentified Person.*

12       The FSICs that Mr. Peck copied rely heavily on an explanation—including screenshots—of

13  a "sniffer" test performed on data packages sent between two portions of Amazon's accused system.

14  *See, e.g.*, Ex. A ¶¶ 70-79, 90-99, 108-111, 213, 259.  Mr. Peck copied-and-pasted these explanations

15  and screenshots, without knowing who performed the tests and who captured the screenshots.  Ex. B

16  at 33:18-34:22.  He chose not to reperform the "sniffer" analysis, or recreate the screenshots, or

17  confirm that a sniffer analysis performed by him would obtain the results shown in the contentions

18  he copied.  *Id.* at 34:23-36:2.

19       Mr. Peck's explanation for this was that he has performed sniffer tests before, and understands

20  them, and he had "no reason to doubt the results of those tests and how they are documented in my

21  report." *Id.*  Mr. Peck's testimony shows that he did not understand what was required of him in this

22  case.  It was not his role to review and adopt MO's FSICs, assuming that the tests described therein

23  were accurately reported.  It was his role to *independently evaluate infringement by doing those tests*.

24  *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson and Co.*, No. C 04-02123 WHA, 2008 WL 2323856,

25  *2 (N.D. Cal. 2008) ("[N]o professional should reasonably rely on such a rigged and biased source

26  of information for any materially important fact to his or her opinion ….  [A]ny opinion based on

27  such untested and partisan foundation is not based on sufficient facts and data within the meaning of

28  Rule 702."); *Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 24 (2d Cir. 2017) ("A failure to

1  validate data by itself can constitute grounds for excluding an expert report."); *Munoz v. Orr*, 200

2  F.3d 291, 301-02 (5th Cir. 2000) (noting that an expert's reliance on data provided by a plaintiff,

3  without conducting independent verification, gives rise to "common-sense skepticism" regarding the

4  expert's evaluation); *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 446 (W.D.N.Y.

5  2005) ("Where an expert fails to verify the accuracy of data upon which the expert … renders an

6  opinion, the resultant analysis and opinion are inherently unscientific requiring exclusion of such

7  evidence under *Daubert*.") (gathering cases).  Because Mr. Peck did not perform an independent

8  analysis, his opinions should be excluded.

9     2. *Mr. Peck Based His Opinion on Irrelevant Information.*

10    Because Mr. Peck copied MO's FSICs, his infringement report includes the same snippets of

11  documents that were the subject of Amazon's motion to strike.  *See* Anderson Decl. ¶ 12 (describing

12  16 pages of screenshots); ECF 206 (Order re Motion to Strike, identifying "eighteen pages of

13  document screenshots … lack[ing] any supporting commentary").  Mr. Peck's report reproduces

14  these snippets as "evidence that Amazon's AC meets" a claim limitation. Ex. A p. 60.  But Amazon's

15  motion to strike explained—with a supporting declaration from Mr. Grant Miller—that several of

16  the documents on which Mr. Peck relies describe features that were either never implemented or

17  never launched.  *Compare, e.g.*, ECF 174-4 at Ex. B (Miller Decl.) ¶¶ 5, 7, 10-11 (identifying

18  Amazon documents) *with* Ex. A ¶¶ 84, 102, 162; *id.* at pp. 60, 64 (relying on those documents).  Mr.

19  Peck's report does not address Mr. Miller's declaration or state a basis to disagree with it.  Instead,

20  Mr. Peck admitted that he was not aware of it.  Ex. B at 216:13-217:12.  And apparently, Mr. Peck

21  never investigated whether the documents he cited relate to the accused system.  As another example

22  of this, Mr. Peck's report relies, in multiple different places, on an article published by Amazon.  *See,*

23  *e.g.*, Ex. A ¶¶ 105, 250, 332.  As also explained in Mr. Miller's prior declaration, ECF 174-4 at Ex.

24  B ¶ 19, and as set forth below in Section VI.B.1.d, that article does not relate to Amazon's

25  Autocomplete system. Again, Mr. Peck either didn't know or didn't care.

26    Even to the extent that the documents in Mr. Peck's report describe Amazon's Autocomplete

27  system, they describe it at various points in time between 2008 and 2021.  *See, e.g.*, Ex. B at 217:14-

28  220:3 (conceding his report relies on a snippet from AMZNMO_00005155 (at -5156), which is a

1   "document dated 2016 or earlier"); Ex. A at p. 73 (reproducing document that discusses the

2   "Berkeley DB"—which was retired in 2008, *id.* ¶ 162—to show infringement).  Mr. Peck relies on

3   these documents indiscriminately, never acknowledging that the alleged damages period in this case

4   spans only June 4, 2019 to August 20, 2021.  *See* Ex. B at 68:19-71:10.  Mr. Peck's report does not

5   explain why various documents dated between 2008 and 2017 relate to his infringement opinion.  To

6   the contrary, when asked, Mr. Peck did not know the damages period in this case.  Ex. B at 68:5-12.

7   He appeared unaware that his task was to prove infringement *during that damages period*.  *Id.* at

8   71:11-17.  Again, it appears that Mr. Peck simply assumed (incorrectly) that all the documents in

9   MO's FSICs were relevant to infringement, and so copied them all into his report.

10          There is one body of evidence that would have demonstrated conclusively how the accused

11   system worked at the relevant time.  That evidence is the code.  But Mr. Peck did not consult it.  Nor

12   did he apply Mr. Smedley's code analysis to his infringement opinion.  *See supra* n.1.[3]  Because Mr.

13   Peck made no attempt to either: (1) consult the best evidence; or (2) tie the evidence that he did use

14   to the accused system, he did not perform a reliable analysis, and his opinion should be excluded.

15   *See, e.g.*, *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F.Supp.2d 1166,

16   1176 (N.D. Cal. 2007) (excluding expert testimony were expert "reaches his opinion by first

17   identifying his conclusion … and then cherry-picking observational studies that support his

18   conclusion and rejecting or ignoring the great weight of the evidence that contradicts his

19   conclusion."); *JDS Techs., Inc. v. Avigilon USA Corp.*, Case No. 15-cv-10385, D.I. 168, at 6-7 (E.D.

20   Mich. July 8, 2019) (deeming an expert's analysis "unreliable" where he "did not rely upon source

21   code … for the vast majority of his conclusions about how the system operated").

22              3.      *Mr. Peck Is Wrong About How Amazon's System Works.*

23          Because Mr. Peck did not base his opinion on source code, he misunderstands Amazon's

24

25   _____

26   [3] Mr. Smedley's analysis is a seven-page document.  Ex. C.  Most of the first page sets forth his background and assignment.  The last three pages list, without explanation, file paths for source code files.  Of the three pages of supposed analysis, ¶¶ 5-6 do not explain how the ▮▮▮▮▮▮▮▮ at the

27   level of detail necessary for this case, *see infra* n.5, and ¶¶ 8-12 describe "caches" other than the one accused in this case.  *See supra* n.1 (re ▮▮▮▮▮▮▮▮▮▮); *infra* n.4 (re ▮▮▮▮).  Mr. Smedley does

28   not apply his source code explanation to any claim language.  Ex. C.  Mr. Peck first reviewed Mr. Smedley analysis on the day his own report was due.  Ex. B at 93:16-25.

6138919

accused system in important ways.  *See infra* Section VI.B.1.d.

           4.     *Mr. Peck Did Not Properly Apply Either Party's Proposed Claim Constructions, or the Ordinary Meaning of the Remaining Claim Terms.*

Mr. Peck's report does not include a discussion or application of either party's proposed claim constructions.  Ex. B at 42:12-16.  While he claims to have read and applied MO's proposed constructions, there is no language in the report doing so.  *Id.* at 43:6-44:7.  To the contrary, as explained below in Section VI.B.3, his analysis as to at least the "asynchronously" claim terms applies a different definition than that proposed by either MO or Amazon.  For this reason alone, his infringement opinion should be excluded.  *See Treehouse Avatar LLC v. Valve Corp.*, Case No. 2:17-cv-01860-RAJ, 2021 WL 4503453, at *2 (W.D. Wash. Oct. 1, 2021) (striking expert report that relied on expert's "own interpretation" of claim term).

As to the remainder of the claim terms, Mr. Peck asserted during his deposition that he applied the "plain meaning."  Ex. B at 247:12-23.  His report does not say so.  And there is no indication that Mr. Peck even knows what that means in the context of his report.  Claim terms need to be interpreted as they would be understood by a person of skill in the art ("POSA") as of their priority date.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).  But Mr. Peck's deposition revealed that he had not formed an opinion as to the understanding of a POSA as of the relevant priority date.  Mr. Peck's report does not include a discussion of the relevant level of skill.  He admitted this.  Ex. B at 41:3-42:11.  He also could not say what the relevant priority date was.  *Id.* at 58:7-59:5.  Mr. Peck thus did not perform the required steps of: (1) identifying the priority date; and (2) applying the claim language as a POSA would have understood it as of that date.  For this reason as well, his report should be excluded as unreliable.[4]

## VI.    SUMMARY JUDGMENT IS APPROPRIATE.

### A.    Summary Judgment is Appropriate if Mr. Peck is Excluded.

If the Court excludes Mr. Peck, then summary judgment is warranted, because MO will have

---

[4] At a minimum, ¶¶ 30, 35, 37, 42, 44, 48-55, and 58-61 should be stricken, because Mr. Peck admitted that they set forth his understanding from counsel.  *Supra* Section V.B.  Some of these paragraphs appear to ascribe a value to Amazon's Autocomplete system.  *See, e.g.*, Ex. A ¶¶ 48-52, 54.  It would be improper for such testimony to go before the jury where: (1) it does not reflect Mr. Peck's opinion; and (2) Mr. Peck is not qualified to render a valuation opinion.  Ex. B at 153:3-154:8.

no infringement expert, and the technology at issue is "beyond the comprehension of laypersons." *Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361 (Fed. Cir. 2004); *see also AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1329 & n.7 (Fed. Cir. 2007) ("[E]xpert infringement testimony is generally required in cases involving complex technology."). Mr. Smedley, who reviewed Amazon's source code but did not render an opinion on how, if at all, that code relates to the Asserted Claims, will not be able to replace Mr. Peck. *See* Ex. C; *see also* Ex. D at 30:14-20 (stating he is not rendering opinions on infringement). Nor will any fact witnesses be able to replace Mr. Peck, including because MO disclosed only that it would use *retained* experts to prove infringement. *See* Ex. J.

**B.    Summary Judgment is Appropriate Even if Mr. Peck is Not Excluded.**

Even if Mr. Peck's testimony is not excluded, summary judgment is appropriate because Amazon's accused system does not practice the Asserted Claims.

*1.    Summary Judgment is Appropriate Because Amazon Does Not Practice the "Caching" Claim Limitations, As MasterObjects Has Defined Them.*

MO cannot show that Amazon creates or uses a "cache" of query results, as required by all Asserted Claims. *See* Ex. L at 33:51-55 ('628 Patent Claim 13, "wherein the server system ***caches query results*** and subsequently determines results by looking up the query in said cache so that it can avoid performing a query for the same input on a data source or looking up said query in a second cache"); Ex. M at 32:65-67 ('866 Patent Claim 1, "a ***cache of queries and search results*** previously retrieved from one or more content sources"); Ex. N at 40:28-30 ('073 Patent Claim 1, "a ***cache of query strings and search results*** based on content queries received from multiple users, whereby cached search results contain a subset of data from one or more content sources") (emphases added).

a)    MasterObjects Has Conceded that the Claimed "Cache" Must Contain Prior Queries and Prior Query Results.

The first step in evaluating infringement is to construe the claims. *Markman v. Westview Instruments*, 517 U.S. 370, 384 (1996). Here, after MO's Claim Construction Reply Brief (ECF 251-3), the parties agree as to a key aspect of how the "cache" terms should be construed.

Amazon had proposed that the claimed "cache" must include *prior* user queries, paired with *prior* search results gathered by the system in response. *See* ECF 251-3 at 5-14; *see also* ECF 232-2 at 1-11. Amazon pointed out that claim constructions in related cases had incorporated this

- 16 -

1  requirement.  ECF 251-3 at 11, n.4.  While initially resisting Amazon's proposal, MO conceded the

2  point on reply: "MasterObjects['] claimed cache is based on prior search queries (*e.g.*, 'ROL') with

3  prior query results (*e.g.*, 'Rolex watches')."  ECF 262 at 9.  MO continued:

> [T]he real [MO] construction here **accords** with its prior construction: (1)
> *Meta*: "cache" is "a store that includes previous queries and search results
> retrieved in response to previous queries;" (2) *eBay*: "query and result
> cache" is "[a] cache which stores previous queries and content or other
> information returned in response to the previous queries;" and (3) *Yahoo!*:
> "query and result cache" is "[a] cache which stores previous queries and
> content or other information returned in response to the previous queries."

8  ECF 262 at 9.  MO has thus conceded that the claimed "cache" must include previous queries and

9  previous search results obtained in response to those previous queries.  *Id.*; *see also* ECF 326 (4/6/22

10 Hrg. Tr.) at 34 (Court noting that the claimed cache is "one that is constructed from prior results from

11 one or more content sources").  MO has also conceded that the prior queries and results must be prior

12 *Autocomplete* queries (*e.g.*, "ROL") and prior *Autocomplete* results (*e.g.*, "Rolex watches").  *Id.*

13           b)    <u>MasterObjects Cannot Show That Amazon's Autocomplete System</u>
                    <u>Has A Cache of Prior Queries or Prior Query Results.</u>

14
15      As a result of MO's concession, it must provide evidence that would allow a reasonable jury

    to conclude that Amazon has a cache of prior Autocomplete queries ("*e.g.*, 'ROL'") and prior
16
    Autocomplete query results ("*e.g.*, 'Rolex watches'").  MO cannot do so.
17
        Mr. Peck's infringement theory as to the "cache" limitations is directed to ████████
18
    ████████████████████████████████.  *See* Ex. B at 105:7-13 ("Q. … [A]re you relying on any
19
    cache besides the ██████ as being the claimed cache of the patents-in-suit? … A. No.").[5]  The most
20
    comprehensive discussion in Mr. Peck's report of Amazon's ██████ appears at ¶¶ 125-139 and 148-
21
    156.  Mr. Peck begins by coining a new phrase—"Query and Results Cache"—and defining it as a
22
    "memory store of prior queries and search results."  Ex. A ¶ 120.  Then, he claims that the "██████s
23

24  ─────────────────

25  [5] MasterObjects' counsel attempted—via leading questions on redirect—to undo this admission,
    pointing to a different database—the ████████████████████—as
26  potentially satisfying the claim language.  Ex. B at 242:7-243:20.  This attempt failed, because
    that redirect testimony identifies the ██████ generally as "a cache," not as the *claimed* cache.  *Id.*;
27  *see also Mitchell v. Geo Grp. Inc.*, 2022 WL 874287, at *6 & n.3 (D. Ariz. Mar. 24, 2022)
    (holding expert to deposition testimony despite contradictory expert report; citing cases).  At any
28  rate, Mr. Peck's expert report does not explain how the ██████ stores prior queries and results and
    otherwise satisfies the limitations of the Asserted Claims.  The ██████ does not do so.  Ex. E ¶ 244.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Ex. F at 6; *see also* Ex. E ¶ 84.  While a user types into Amazon's product search bar an incomplete

25    query, Amazon's Autocomplete system finds the matching "Prefix" in its ▮▮▮▮▮▮▮▮ *Id.* ¶ 103.

26    It then follows ▮▮▮▮▮▮▮▮▮▮▮▮ to gather multiple responsive

27    "Keywords" (suggestions for complete product searches) ▮▮▮▮▮▮▮▮ *Id.*  The

28    result of that process is that the user is able to see, and choose from, a drop-down list of Autocomplete

1    search suggestions.  *Id.* ¶¶ 86, 90, 103.

2            An assessment of whether the ████ contain prior *Autocomplete* (i.e., incomplete) queries

3    and prior corresponding *Autocomplet*e responses requires an understanding of how the ████ are

4    built.  Those ████ are *not* built by saving or compiling prior Autocomplete queries or results.  Ex.

5    E ¶¶ 68-70, 106-112.  Instead, ███████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████  *Id.* ¶ 111.  As an example, if a lot of users last week performed product searches

9    for "Nike shoes," "Nike shoes" will become a "Keyword" in the ██████████  That

10   "Keyword"—"Nike shoes"—████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████  And a user who later types "Ni" into the Amazon

17   search bar will receive "Nike shoes" and "Nintendo switch" as Autocomplete suggestions.

18           Based on the foregoing explanation, the accused ████ store neither prior Autocomplete

19   queries (incomplete queries sent from user's device to the Autocomplete system) nor the

20   corresponding search results (lists of suggested product searches sent by the Autocomplete system

21   in response).  *See, e.g.*, Ex. E ¶ 110; Miller Decl. ¶¶ 3-4.  Because the Asserted Claims require that

22   the accused ████ store both, Amazon's system does not infringe.

23           MO may argue that the "cache" limitations can be satisfied by prior *product search* queries

24   and responses, as opposed to prior *Autocomplete* queries and responses.  This argument would be

25   contrary to MO's concession, above, and to the plain language of the claims.  For example, Claim

26   13 of the '628 Patent requires that the same query results that are gathered and sent "while [the server

27   system] is receiving said query messages" be the query results that are stored in the cache.  Ex. E

28   ¶¶ 198-203; *see also* ECF 252-61 (Turnbull Supp. CC Decl.) ¶¶ 6-11 (explaining same for '866 and

- 19 -

1    '073 Patents).  Because the only query messages in Amazon's accused system that are sent and

2    received while the user continues typing are the Autocomplete query messages, those are the prior

3    query messages that must be stored in the claimed cache ███████████████████████████████

4    Even putting that aside, and assuming for sake of argument that *product search* queries and results

5    could satisfy the "cache" limitations, Amazon cannot infringe.  That is because, ████████████

6    ████████████████████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████ which would be the information conveyed in the new

8    webpage rendered when a product search is performed.  Ex. E ¶ 110; Miller Decl. ¶ 4.

9                    d)    MasterObjects' Conclusory Expert Testimony Regarding Caching
                          Does Not Create A Triable Issue of Fact.
10

11           In light of this explanation, Mr. Peck's expert report cannot create a triable issue of fact.  To

12   the extent Mr. Peck's report sets forth a cognizable infringement theory at all, it appears to be based

13   on a fundamental misunderstanding of Amazon's accused system, untethered to evidence.

14           It is unclear why Mr. Peck believes the ████████ satisfy the "cache" limitations.  Mr. Peck's

15   report never explains what prior queries or prior query results Mr. Peck asserts are stored in ██

16   ████████  *See* Ex. A ¶¶ 125-139, 148-156.  It never explains how the ████████ are built in a way that

17   would lead to the conclusion that they contain prior queries or prior query results of any form.  *Id.*

18   Instead, the section titled "***How Amazon*** ████████████████████████" constitutes a single sentence,

19   stating, without support, that "Amazon uses multiple query and results caches in ████████████████

20   ████████████████████████████ contain a subset of data from one or more content sources, themselves

21   query and results caches."  *Id.* ¶ 134.  This conclusory assertion does not support the idea that the

22   information in the ████████ includes prior queries or prior query results, let alone both.

23           Most likely, the lack of clarity of Mr. Peck's expert opinion results from the fact that he did

24   not evaluate Amazon's handling of *product search* queries, and so does not understand the difference

25   between *product search* queries and *Autocomplete* queries.   *See* Ex. B at 113:9-128:20.   His

26   infringement opinion thus appears to be based on the incorrect assumption that any reference to

27   "queries" in Amazon's system is a reference to *Autocomplete* queries.  To illustrate this, ¶ 136 of Mr.

28   Peck's report asserts that "████████████████ reflect the most popular search prefixes then trending"

     and that "[t]his information is then sent to AC to use in its ████████████████."'  This paragraph

                                              - 20 -

1   could be read to suggest that prior Autocomplete queries are used in the creation of the ████ .  Mr.

2   Peck testified that is his belief.  Ex. B at 252:13-24.  But ¶ 136 cites no supporting evidence, and

3   none of the evidence in his report supports this idea.[6]  To the extent Mr. Peck is suggesting that prior

4   Autocomplete queries become the ██████████████████████ , he is just wrong, as Dr.

5   Turnbull has explained.  Ex. E ¶ 109 n.9; *see General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)

6   ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

7   opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.")

8         Finally, in explaining why Amazon's accused system infringes the "cache" limitations of the

9   '866 and '073 Patents, Mr. Peck relies almost entirely on a quote from an Amazon-published article.

10  *See, e.g.*, Ex. A ¶¶ 250, 332.  Mr. Peck claims he cited that article because it "relate[d] to the relevant

11  aspect of identifying content from the ████████████████████████████████

12  ███████   Ex. B at 215:7-216:6.  There no support for Mr. Peck's assumption that this article

13  has anything to do with ████████████ .  Ex. E ¶ 249; *see also* Miller Decl. ¶¶ 6-7.  It

14  never mentions ████████████ .  Ex. K.  To the contrary, the single paragraph that Mr.

15  Peck cites (copied from MO's contentions) discusses storing "affinity scores between query

16  keywords and product IDs."  Ex. A ¶¶ 250, 332.  As explained above, "Keywords" in Amazon's

17  system refers to *product* searches, not *Autocomplete* searches.  And product IDs are identifiers of

18  *products* in Amazon's system, which are irrelevant to Autocomplete.  Miller Decl. ¶ 6.  Indeed, the

19  article makes clear that its discussion of "queries" is directed to *product search* queries, giving

20  examples of such queries as "adidas mens pants."  Ex. K at 1.  Here, as elsewhere, Mr. Peck assumed

21  incorrectly that the word "query" in relation to Amazon's system always and only means

22  *Autocomplete* queries.

23         Mr. Peck's unsupported assumptions about Amazon's ████ cannot withstand summary

24  judgment.  This is especially so because Amazon has introduced and explained the source code

25  showing why his assumptions are incorrect.  *See JDS Techs.*, D.I. 168, at 6-7 ("While Dr. Lock

26  ─────────────────────

27  [6] Mr. Smedley's report—which Mr. Peck claims supports MO's infringement case, Ex. A ¶ 372—
    does not help on this point.  Like Mr. Peck, Mr. Smedley only states that the ████████████████

28  Ex. C ¶¶ 5-6; *see also* Ex. E ¶¶ 252-253.

1   opined differently, he did not explain how his opinions were based upon the actual code.  Particularly

2   in light of Avigilon's contrary evidence that its source code does not employ the claimed methods

3   and systems, Dr. Lock's naked and factually unsupported opinion is not a reliable basis for a

4   reasonable jury to find the system [infringes].”); *Teradata Corp. v. SAP SE*, 570 F.Supp.3d 810, 852

5   (N.D. Cal. 2021) (“[W]hen, as here, an expert opinion is not supported by sufficient facts to validate

6   it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion

7   unreasonable, it cannot support a jury's verdict and therefore summary judgment is appropriate.”)

8   (cleaned up).  MO had access to Amazon's code, and even hired an analyst to evaluate it.  MO's

9   decision not to cite Amazon's code—and to instead rely on irrelevant documents—was a conscious

10  one.  As Amazon's witnesses have explained, unrebutted, the code makes clear Amazon's non-

11  infringement.  *Supra* Section VI.B.1.c.

12              2.      *Summary Judgment is Appropriate Because MasterObjects Cannot Show*
                        *Infringement of the "Caching" Limitations Under Amazon's Constructions.*

13

14          Another  important  aspect  of  Amazon's  proposed  constructions  for  the  "caching"  claim

15  limitations was that they "require[] that the claimed system be able to obtain query result sets from

    sources other than the store of query result sets previously saved by the server system."  *See* ECF
16
    237-1 at 1, 10, 11.  As Amazon explained, the language of the Asserted Claims, read in the context
17
    of the Specification, makes clear that, if there is no result in the claimed cache, the system must be
18
    able to go look for that result elsewhere.  ECF 251-5 at 5-14; *see also* '628 Patent Claim 13 ("the
19
    server system … subsequently determines results by looking up the query in said cache so that it can
20
    avoid performing a query for the same input on a data source or looking up said query in a second
21
    cache"); ECF 326 at 33-34 (the Court noting that the claim language "has a lot of extra phrases in
22
    there that goes way beyond cache only").  That meaning is implicit in the word "cache," and is the
23
    only use of a "cache" described in the Specification.  ECF 251-5 at 5-14.  MO's reply brief skates
24
    past these arguments, not directly addressing the claim language, the Specification cites, or the
25
    dictionary definitions of "cache" that Amazon identified.  *See* ECF 262 at 8-10.
26
            Mr. Peck admitted that he did not render an infringement opinion under Amazon's
27
    constructions.  Ex. B at 42:23-43:5.  Thus, if the Court adopts Amazon's proposal that the claimed
28
    system must be able to access a data source other than the alleged "cache" for query results, then MO

- 22 -

6138919

1  cannot show infringement.  This is especially so because Mr. Peck has not identified a data structure

2  that presumably acts as an underlying data source for the "cache."  *See* Ex. E ¶ 167, n.17; *see also*

3  *id.* ¶¶ 208-213, 227-228.  For this reason as well, summary judgment is appropriate.

4              3.       *Summary Judgment is Warranted Because Amazon Does Not Practice the*
                        *"Asynchronous" Limitation Under Any Proposed Construction.*

5

6        All Asserted Claims require that the server respond to the client "asynchronously."  *See* Ex.

7  L at 33:38-40 ('628 Patent Claim 13, "the server system receiving and asynchronously responding"),

8  Ex. M at 33:4-7 ('866 Patent Claim 1, "asynchronously sending, by the server system"), Ex. N at

9  39:41-43 ('073 Patent Claim 1, "asynchronously receiving, on the client computer").  MO has

10  proposed that "asynchronously" in this context means "each side of the communication is free to

11  communicate without waiting for the other side."  ECF 237-1 at 12-18.  But Mr. Peck's report does

12  not explain why he believes the accused Amazon server is "free to communicate" with the client

13  "without waiting for the other side."  Instead, Mr. Peck's report defines "asynchronously" differently,

14  as "the client and the server system [are] free to communicate with each other even as a user type[s]."

15  Ex. A ¶ 32; *see also id.* ¶ 82 (applying this definition); ¶¶ 261, 348 (same).  This difference is

16  significant.  It is undisputed that Amazon's Autocomplete system receives and responds to messages

17  as a user types into the Amazon search bar.  But, while that functionality may meet a requirement

18  that the server be "free to communicate … even as a user types," it does *not* meet a requirement that

19  the server be "free to communicate without waiting for the other side."  To the contrary, as explained

20  below, the Amazon server waits for messages from the Amazon client, and responds to those.

21        Mr. Peck's report explains that, as a user types a query into an Amazon search bar, the

22  Amazon client sends a "GET method" to the accused server system.  Ex. A ¶¶ 72-73.  Mr. Peck then

23  explains that the "server receives the HTTP GET method and sends a response."  *Id.* ¶ 77.  There is

24  no suggestion that the Amazon server ever sends a response to the Amazon client without first

25  receiving a message from that client.  In other words, there is no suggestion in Mr. Peck's report that

26  Amazon's server is "free to communicate without waiting" for the client to first send a request, which

27  would be required to meet both parties' proposed constructions of "asynchronously."  Because MO

28  does not have any expert testimony describing how Amazon infringes the "asynchronously"

6138919

1  limitation under *either* side's construction, summary judgment is warranted. [7]

2          During claim construction briefing, MO argued that its proposed construction does not mean

3  what it says.  For example, MO argued that its proposed construction does not require that the server

4  be able to initiate communications with the client.  ECF 262 at 13-14.  But if MO "wanted to adopt

5  such a claim construction position, it could (and should) have sought a construction to that effect."

6  *Yufa v. TSI Inc.*, No. SA CV 12-1614 FMO (JCGx), 2014 WL 11398761, at *7 (C.D. Cal. Sept. 22,

7  2014) (cleaned up).  For example, MO could have proposed the language that Mr. Peck applied—

8  that the client and server are "free to communicate with each other even as a user type[s]," Ex. A

9  ¶ 32—and then argued why that construction was appropriate (it would not be).  But MO did not do

10  so.  And MO's expert did not apply MO's proposed construction in any way—even to explain why

11  it means what MO says it means and how that applies to Amazon's system.  For these reasons, MO's

12  allegations as to the "asynchronously" limitations must fail.

13          Even if the Court allows MO to align its claim construction proposal with its current

14  arguments, summary judgment is appropriate.  That is because the Court should *reject* MO's new

15  proposed construction.  Any construction that does not require both the client and the server to be

16  able to initiate communications at any moment in time is incorrect, not least because it would be

17  contrary to clear definitional language in the Specification.  *See* Ex. L at 12:40-42 ("The system is

18  bi-directional and asynchronous, in that both the Client and the Server can initiate communications

19  at any moment in time."); *see also* ECF 252 at 22-25.  As set forth in Amazon's claim construction

20  brief, Amazon's proposed construction, which requires that "both the client and the server system

21  can initiate communications at any moment in time," is consistent with the definition of

22  "asynchronous" set forth in the Specification and other intrinsic evidence, is consistent with two prior

23  court orders construing similar claim language, and—unlike MO's construction—is supported by

24

---

25  [7] In explaining his opinion that the server sends that response *asynchronously*, Mr. Peck's report states that the "HTTP GET method is sent using AJAX," and the "acronym AJAX means

26  'Asynchronous Javascript and XML.'"  *Id.* ¶ 81; *see also id.* ¶¶ 260-261, 348.  Of course, the fact that the name of a programming concept includes the word "asynchronous" does not establish that

27  the use of that programming concept in one part of Amazon's system satisfies the "asynchronously" limitations, as properly construed.  Indeed, Mr. Peck's report acknowledges that the use of the word

28  "asynchronous" in AJAX refers to operations being performed "in the background," which is not how either party has construed "asynchronously" in this case.  *Id.*

6138919

1    expert testimony.  ECF 252 at 22-25.

2              4.    *Summary Judgment is Appropriate Because Amazon Does Not Practice the*
                     *"Query Messages" Limitations Under Amazon's Proposed Construction.*
3
4         Amazon's last case-dispositive claim construction proposal relates to the "query messages"

5    limitations.  Every Asserted Claim requires sending some form of query message.  *See* '628 Patent

6    Claim 13 ("query messages"); '866 Patent Claim 1 ("request message"); '073 Patent Claim 1 ("string

7    representing an incomplete search query").  As Amazon has explained, these messages must

8    "consist[] of only the changes to the input string that were not sent in any previous consecutive query

9    message."  *See* ECF 237-1 at 18-19, 24.  In other words, the messages sent as a user types "Harry

10   Potter" would be "H," and then "a," and then "r," *not* "H," "Ha," "Har."  This construction would be

11   case dispositive, both because Mr. Peck admitted that he did not apply Amazon's proposed

12   constructions, *see* Ex. B at 42:23-43:5, and because there is no evidence that Amazon sends its

13   messages in any format other than "H," and then "Ha," and then "Har."  *See, e.g.*, Ex. A ¶ 73; Ex. E

14   ¶¶ 186-192.

15        Amazon's construction is correct both because the Specification specifically limits the

16   invention to sending "only the changes," and because a prior court has so ruled, resulting in collateral

17   estoppel against MO.  *See* ECF 251-3 at 14-19; *see also MasterObjects, Inc. v. Google, Inc.*, Case

18   No. 11-1054 PJH, ECF 153 (N.D. Cal. May 28, 2013).  MO's Claim Construction Reply argued that

19   Amazon waived collateral estoppel by not pleading it.  ECF 262 at 11.  This is not so, for two reasons.

20   *First*, Amazon pled "Equitable Defenses."  ECF 161 ¶ 301.  This includes the equitable doctrine of

21   collateral estoppel.  *See, e.g.*, *Callahan v. PeopleConnect, Inc.*, No. 20-CV-09203-EMC, 2022 WL

22   2132912, at *3 (N.D. Cal. June 14, 2022).  *Second*, "[i]n the absence of a showing of prejudice," an

23   affirmative defense may be raised later.  *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993).

24   For waiver to apply, the plaintiff must point to "a tangible way in which it was prejudiced by the

25   delay."  *Ledo Fin. Corp. v. Summers*, 122 F.3d 825, 827 (9th Cir. 1997).  Here, MO was not

26   prejudiced, because it was able to respond to Amazon's estoppel argument.  *See* ECF 262 at 11-13.

     **VII.   CONCLUSION**
27
28        For the foregoing reasons, Amazon respectfully requests that the Court: (1) strike the

     infringement expert report of Mr. John Peck; and (2) grant summary judgment of non-infringement.

6138919

1  Dated:  July 28, 2022                          HUESTON HENNIGAN LLP

2

3                                           By:   */s/ Christina V. Rayburn*
                                                 Christina V. Rayburn
4
                                                 Attorneys for Defendant
5                                                AMAZON.COM, INC.

6

7

8                          **CERTIFICATE OF SERVICE**

9        I hereby certify that on July 28, 2022, a true and correct copy of the foregoing Motion

10  for Summary Judgment and associated exhibits were served upon counsel of record via email.

11                                               */s/ Christina V. Rayburn*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:20-cv-08103-WHA
AMAZON MSJ/MOTION TO EXCLUDE

6138919